Application of Power Fuels, Inc., Minot, North Dakota, for a Special Certificate of Public Convenience and Necessity.

POWER FUELS, INC., Applicant [Respondent Below] and Appellee,

v.

Richard ELKIN, Ben Wolf, and Bruce Hagen, as Members of the North Dakota Public Service Commission, Respondents [Respondents Below] and Appellees,

and

Northern Tank Lines and Big "M" Oil Field Service, Inc., Protestants,

and

Getter Trucking, Inc., Protestant [Appellant Below],

and

Matador Service, Inc., Protestant [Appellant Below] and Appellant.

Civ. No. 9588.

Supreme Court of North Dakota.

Aug. 22, 1979.

F. John Smith, Bismarck, for applicant [respondent below] and appellee Power Fuels, Inc.

David W. Tiistola, Sp. Asst. Atty. Gen., Bismarck, for respondents [respondents below] and appellees Elkin, Wolf, and Hagen as Members of the North Dakota Public Service Commission.

R. W. Wheeler, of Wheeler, Wolf, Wefald & Peterson, Bismarck, for protestant [appellant below] and appellant Matador Service, Inc.

VANDE WALLE, Justice.

This is an appeal from a judgment of the district court of Burleigh County affirming

an order of the Public Service Commission that granted Power Fuels, Inc., a special common motor carrier certificate of public convenience and necessity authorizing it to transport crude oil, water, and salt water, in bulk, in tank vehicles to and from certain points and places in North Dakota. We affirm.

In March 1977, Power Fuels, Inc. ("Power Fuels"), filed an application with the Public Service Commission ("PSC") seeking a special common motor-carrier certificate of public convenience and necessity authorizing it to transport crude oil, water, and salt water, in bulk, in tank vehicles to, from, and between all points and places in North Dakota lying west of a line defined in the application. Getter Trucking, Inc. ("Getter"), Matador Service, Inc. ("Matador"), Big "M" Oil Field Services, Inc. ("Big 'M' "), and Northern Tank Lines ("Northern Tank")—special common motor carriers holding authority to provide all, or a part of, the transportation service proposed in the application—protested the application.

In April 1977, Power Fuels filed an application for temporary authority to provide service until such time as the application could be heard and determined by the PSC. The PSC granted temporary authority on April 12, 1977, and notified Power Fuels on May 20, 1977, that it had met all necessary "compliances" and could initiate operations. Temporary authority was granted to Power Fuels pursuant to Section 49–18–12, N.D. C.C.[1]

The hearing on the application for permanent authority was held on September 8, 1977. On November 25, 1977, the PSC issued its findings of fact, conclusions of law, and order granting Power Fuels the special certificate of convenience and necessity. Getter and Matador appealed to the district court of Burleigh County. On May 25, 1978, the district court remanded the case to the PSC with the direction that the PSC make proper findings of fact and that, after the PSC had issued proper findings of fact, the matter be returned to the district court for review. On July 6, 1978, the PSC entered its amended findings of fact, conclusions of law, and order and returned the matter to the district court. The district court, after reviewing the matter, sustained the PSC order and judgment was entered on October 12, 1978. Matador appeals that judgment to this court.

Matador, on appeal, has advanced essentially three issues:

1. Whether or not the PSC's granting of temporary authority to Power Fuels was unlawful.

2. Whether or not the statutory requirement that, on review, a court must determine if the administrative agency's findings of fact are supported by a preponderance of the evidence, is constitutional.

3. Whether or not the PSC's findings of fact are supported by a preponderance of the evidence.

I

■ First, Matador argues that the PSC should not have granted Power Fuels a temporary permit for service and, because

---

1. Section 49–18–12, N.D.C.C., provides:

"No common motor carrier shall operate within this state without first having obtained from the commission a certificate of public convenience and necessity. Application therefor shall be made upon forms to be prescribed by the commission. The commission shall make regulations for the filing of such application. The application must contain a financial statement, a list of equipment to be used, a description of the type of service offered, and the route and territory to be served. However, upon receipt of such an application and when there is an immediate and urgent need the commission shall have the authority to grant a temporary permit for service by a common motor carrier to a specified point or points or within a specified territory having no carrier service capable of meeting such need. Such temporary permit shall be granted without a hearing and, unless suspended or revoked for good cause, shall be valid for such time as the commission shall specify but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that the corresponding certificate of public convenience and necessity shall be granted after the hearing on the application. Such temporary permit shall be transferable only after notice to all interested parties and approval by the commission, after opportunity for hearing."

the PSC should not have granted such permit, its Amended Finding of Fact No. 6 should not have been made. In Amended Finding of Fact No. 6 the PSC stated:

"Under the Temporary Authority granted by the Public Service Commission, Power Fuels has been engaged in a satisfactory common carrier transportation of crude oil and water for Wiser Oil, Phillips Petroleum, Murphy Oil, Ward-Williston, Zinke and Phillipe, utilizing three trucks and three trailers stationed at Minot, North Dakota."

In support of its position Matador has included in the appendix a copy of a Burleigh County district court decision in *Dan Dugan Transport Company v. Elkin*, Civil No. 26208 (Sept. 7, 1977). No appeal was taken from the decision in *Dan Dugan*. *Dan Dugan* apparently was an action for declaratory judgment naming the PSC as a party and asking the court to construe the provisions of Section 49–18–12, N.D.C.C., insofar as those provisions concern the issuance of a temporary permit. The Burleigh County district court determined that whether or not a temporary permit should be issued to an applicant was not a matter that rested solely in the discretion of the members of the PSC. It concluded that the PSC has the authority to grant temporary permits upon a showing that (1) there is an immediate and urgent need for the proposed service and (2) there is no carrier capable of meeting that need. Furthermore, the district court concluded that where the records of the PSC reveal that an existing common motor carrier is authorized to provide the service in question, some procedure should be utilized by the PSC to determine whether or not that carrier is willing and able to provide the service required by the immediate, urgent need therefor. The district court determined, however, that the precise summary procedure to be used by the PSC in reaching the determination required by statute should be left to the PSC but that the PSC cannot lawfully confine itself to unsupported allegations contained in an application for a temporary permit. Matador now asks that we give the PSC "some further hints" concerning what should be required of an applicant in the ex parte proceeding to permit the PSC to conclude that there is an immediate and urgent need for common motor-carrier service requiring the issuance of a temporary permit under Section 49–18–12, N.D.C.C.

The PSC and Power Fuels note, however, that the decision in *Dan Dugan* was issued some five months after the temporary permit had been issued to Power Fuels by the PSC, and that Power Fuels should not be penalized by a decision issued after the temporary permit had been issued. Additionally, both the PSC and Power Fuels argue that the evidence submitted at the hearing before the PSC, on which Amended Finding No. 6 was based, was used only for the purpose of determining whether or not Power Fuels provided satisfactory service during the time it held the temporary permit and not for the purpose of determining whether or not there was a need for additional service. It is obvious that such evidence could not be used to establish a need for additional service because Section 49–18–12, N.D.C.C., provides, in part, that the temporary permit "shall create no presumption that the corresponding certificate of public convenience and necessity shall be granted after the hearing on the application." The PSC also argues that there is no evidence in the record upon which we can conclude that it has failed to adhere to the decision in *Dan Dugan* because, as we have already noted, that decision was issued after the temporary permit was granted by the PSC.

We agree with the PSC and Power Fuels that the method of issuance of the temporary permit should not be decided by this court in the context of the present appeal. If the decision in *Dan Dugan* was meant to be instructive to the PSC in its issuance of temporary permits, it could not apply to a permit issued some five months prior to that decision. Although Matador in its brief alleges that the PSC has "really done nothing to effect a change in its policy relating to the issuance of temporary common motor carrier authority under the stat-

ute," evidence of that allegation is not before us. A review of the transcript of the proceedings before the PSC on the issuance of the certificate of convenience and necessity and the PSC's findings of fact and conclusions of law do not reflect that the testimony concerning the satisfactory service provided by Power Fuels under its temporary authority was used by the PSC as a presumption that the certificate of public convenience and necessity should be granted. Furthermore, we agree with the Burleigh County district court that the PSC should determine the precise summary procedure to be used by the PSC in deciding whether or not temporary authority should be granted. The Legislature obviously also has authority to determine that procedure. Surely this court should not do so, however, particularly where there is no record to reflect that the PSC has refused to abide by the decision of the Burleigh County district court in *Dan Dugan.*

## II

The second issue Matador raises concerns the scope of review on appeal from a decision of an administrative agency. Prior to July 1, 1977, Section 28–32–19, N.D.C.C., provided, in part, that the decision of the agency should be affirmed unless "the findings of fact made by the agency are not supported by the evidence." This provision was construed to mean that the findings must be supported by "substantial evidence." E. g., *Geo. E. Haggart, Inc. v. North Dakota Workmen's Compensation Bureau,* 171 N.W.2d 104 (N.D.1969).

In 1977, the Legislature amended Section 28–32–19, N.D.C.C., to require that the decision of the agency be affirmed unless the findings of fact made by the agency "are not supported by a preponderance of the evidence." In its decision the district court determined, in part:

"3. The standard of review of agency decisions found at NDCC 28–32–19, i. e.

preponderance of the evidence, must be interpreted as triggering the traditional 'substantial evidence' test. There is no more stringent standard which a district court could adopt on review [of] an agency decision, and not substitute its opinion for that of the administrative agency. Application of the traditional 'preponderance' test would invest administrative determinations in the courts, an action forbidden by Section 94 (previously Section 96) of the North Dakota Constitution; and

"4. Substantial evidence exists in the record to support the Findings of Fact made by the Commission; the Findings of Fact support the Conclusion[s] of Law; and the Commission's Order is supported by its Conclusions of Law." [2]

Section 94 of the North Dakota Constitution provides, in part, that "No duties shall be imposed by law upon the supreme court or any of the justices thereof, except such as are judicial, . . ." The decision of the district court that the preponderance standard would impose other than judicial duties on the judiciary is, as amplified by the briefs of the parties, predicated on the assumption that the preponderance standard would require this court to substitute its judgment for that of the administrative agency and would require us to make a determination that is legislative or administrative, rather than judicial, in nature. Our review is governed by the same standard which governs the review by the district court. See Sec. 28–32–21, N.D.C.C.

In considering the significance of the 1977 amendment of Section 28–32–19(5), N.D.C.C., this court has previously stated:

"Section 28–32–19, NDCC, as amended, sets forth the standard for review of the agency's decision in the district court. The only rational legal conclusion that can be reached from the amendment and the *Haggart* case is that on appeal the Supreme Court reviews the administra-

---

2. While the argument by the parties to this appeal is concerned primarily with whether or not the preponderance standard of review is constitutional, that issue is significant only if

the findings of fact made by the PSC in this matter are supported by substantial evidence but not by a preponderance of the evidence.

tive agency's decision and not the district court's decision except as to limited permissible action taken by the district court in such matters as attorney's fees on appeal and the taking of additional testimony as provided for in § 65–10–03, NDCC, as amended, § 65–10–01, as amended, and § 28–32–18. Furthermore, the standard of review in the Supreme Court is the same as the standard under which the district court reviews the decision. (§§ 28–32–21, 28–32–19, NDCC).

"Accordingly we review the decision of the Bureau and consider these issues raised which need to be resolved.

"In considering the issues raised by the claimant whether or not the Bureau's findings are supported by the preponderance of the evidence, we note that § 28–32–19, NDCC, as amended in 1977, requires the Bureau's findings of fact to be supported by a preponderance of the evidence. The immediate previous standard based on the provisions of § 28–32–19, prior to the 1977 amendment and case law, *Bank of Rhame* infra and predecessors, was substantial evidence.

"Our court, in *Benzmiller v. Swanson*, 117 N.W.2d 281 (N.D.1962), relying upon *Barkow v. Donovan Wire & Iron Co.*, 190 Mich. 563, 157 N.W. 55 (1916), defined preponderance of evidence as 'evidence more worthy of belief,' or 'the greater weight of the evidence' or 'testimony that brings the greater conviction of truth.'" [Footnotes omitted.] *Steele v. North Dakota Workmen's Comp. Bur.*, 273 N.W.2d 692, 696–697 (N.D.1978).

In a subsequent decision we cited *Steele* and said:

"In reviewing the findings of an administrator under the Administrative Agencies Practice Act, notwithstanding the amendment to Section 28–32–19(5), N.D.C.C., because of the constitutional prohibition involved in the doctrine of the separation of powers against delegation of nonjudicial functions to the judiciary and Section 94 of our State Constitution, we must exercise restraint. See *Geo. E.*

*Haggart, Inc. v. North Dakota Work. Comp. Bur., supra* at 112; *City of Carrington v. Foster County*, 166 N.W.2d 377, 382, 385 (N.D.1969); see also *Tang v. Ping*, 209 N.W.2d 624, 628 (N.D.1973)." *Allstate Insurance Co. v. Knutson*, 278 N.W.2d 383, 388 (N.D.1979).

In *Allstate*, after reviewing the evidence, the court concluded the Insurance Commissioner's order was "neither supported by a preponderance of the evidence, nor is it in accordance with law; . . ." *Allstate Insurance Co. v. Knutson, supra*, 278 N.W.2d at 392.

In *Tang v. Ping*, 209 N.W.2d 624, 628 (N.D.1973), cited in *Allstate*, this court quoted *Hjelle v. Sornsin Construction Co.*, 173 N.W.2d 431, 432 (N.D.1970), as follows:

"Courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so, to the end that they may be sustained."

In *State Insurance Commissioner v. National Bureau of Casualty Underwriters*, 248 Md. 292, 236 A.2d 282 (1967), the Court of Appeals of Maryland faced arguments similar to the ones with which we are now concerned. The 1963 Maryland Legislature had enacted a new statute to govern and control the insurance business in Maryland. The appeal provision in the statute, Md. Ann.Code Art. 48A, § 245(2),[3] required the court to affirm, reverse, or modify the order or decision in whole or in part if it found that the order or decision was "not in accordance with law," or was "not supported by the preponderance of the evidence on consideration of the record as a whole." A decision of the Insurance Commissioner was appealed to the Baltimore city court, which dismissed the appeal and held that rate regulation was a legislative action and that the preponderance-of-the-evidence test would require the court to unconstitutionally find facts and substitute its judgment on the facts found for that of the Insurance Commissioner. On appeal, the Maryland Court of Appeals, in a thorough and excellent discussion of review by

---

**3.** This provision has subsequently been codified as Md.Ann.Code Art. 48A, § 242B(2).

the courts of administrative agency decisions, held that the statute requiring the court to determine whether or not the order of the Insurance Commissioner was supported by a "preponderance of the evidence" did not impose nonjudicial duties on the court in violation of the State Constitution; that the statute required that the court must rule whether or not the Insurance Commissioner followed the legislative directive to reach a factual conclusion based on a preponderance of the evidence; that the statute did not require the court to make an independent decision whether or not it would have valued the evidence in the same way and would have reached the same result; and that the statutory standard imposed on the court was not to decide whether the Insurance Commissioner was right in his factual determinations and inferences but whether or not those determinations could reasonably have been made by a reasoning mind using the preponderance-of-the-evidence test. The Maryland court noted that the "preponderance of the evidence" test and the "weight of evidence" test are largely synonymous. The opinion of the court is instructive but too lengthy to quote in its entirety. However, one conclusion of the court is particularly pertinent:

"Whichever of the recognized tests the court uses—substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record—its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards

the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment. [Citations omitted.]

"We hold that a court in reviewing legislative actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, without exercising nonjudicial functions, provided it does not itself make independent findings of fact or substitute its judgment for that of the agency. Section 245 of Art. 48A, properly construed, does no more than permissibly require the court to decide (1) the legality of the Insurance Commissioner's actions, and (2) whether a reasoning mind reasonably could have determined that the factual conclusion reached was proven by the weight of the evidence on the record as a whole."[4] 248 Md. at 309–310, 236 A.2d at 291–292.

We agree with the reasoning of the Maryland Court of Appeals and find it consistent with our decision in *Steele v. North Dakota Workmen's Comp. Bur., supra*. This result was foreshadowed by the decision of this court in *Allstate Insurance Co. v. Knutson, supra*. In construing the "preponderance of the evidence" standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. In so doing we conclude that we are not exercising a nonjudicial function as prohibited by Section 94 of the North Dakota

---

**4.** This particular holding has been cited and followed in numerous subsequent decisions of the Maryland Court of Appeals. The most recently published decision we have discovered

following this holding is *Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 396 A.2d 1080 (1979).

Constitution,[5] nor are we violating any separation-of-powers doctrine inherent in the North Dakota Constitution.

## III

Thirdly, Matador contends that the evidence does not support the finding by the PSC that public convenience and necessity require additional common-carrier authority. It also urges that the PSC conclusion that increased oil activity has resulted in a need for additional common motor-carrier authority ignores the existence of common motor carriers who have increased their investments in motor-carrier equipment as necessary to meet the additional transportation requirements related to the increased oil activity.

Section 49–18–14, N.D.C.C., sets forth the factors to be considered by the PSC in granting a certificate of authority:

"Before granting a certificate to a common motor carrier, the commission shall take into consideration:

"1. Existing travel upon the route of the carrier;

"2. The increased cost of maintaining the highway concerned;

"3. The effect on other essential forms of transportation; and

"4. Existing transportation facilities in the territory for which a certificate is sought.

"In case it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, the commission shall not grant such certificate."

It is with subsection 4 as well as the prohibition against the granting of a certificate, if it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, with which most of the evidence and testimony before the PSC was concerned.

The PSC's findings of fact and conclusions of law are as follows:

### "AMENDED FINDINGS OF FACT

"1.

"At the outset of the hearing, Applicant requested to amend the application in regards to the area involved in the application. Applicant requested the application to read 'Thence west along the south boundary of McHenry and Ward Counties until it intersects with Highway No. 83,' and as the amendment did not broaden the application in any manner, Applicant's request was granted by the Commission.

"2.

"The Applicant, Power Fuels, Inc., is a corporation whose business is the buying and selling of liquified propane gas and crude oil. Propane is purchased from Solar Gas, Dome Petroleum, and Amoco and sold to Stepanek's Gas, Behm's LP Gas, and Behm's Propane, Inc., the latter two companies being controlled by individuals who also direct Power Fuels, Inc. Crude oil is also bought from Sunbehm Gas, a related company, and sold to Ashland Oil.

"3.

"The buy-sell transaction commences with an order for the product being placed with Power Fuels; a truck is dispatched to load the product, title to which is obtained by Power Fuels; ownership remains with Power Fuels until delivered to the ordering party. No storage is owned by Power Fuels, other than the capacity of the vehicle in which the product is transported.

5. See, e. g., *Application of Ditsworth*, 78 N.D. 3, 48 N.W.2d 22 (1951), in which this court noted that when an appeal from the PSC taken pursuant to the provisions of the predecessor of Chapter 28–32, N.D.C.C. [the Administrative Agencies Practice Act], reaches this court for review, the court "tries the case anew upon the record, not as an administrative body exercising administrative discretion but as a court exercising judicial powers." 78 N.D. at 9, 48 N.W.2d at 26.

At the time of the decision in *Ditsworth*, the scope of review was "trial anew." Secs. 28–3221 and 28–2732, N.D.R.C.1943. See, however, *Geo. E. Haggart, Inc. v. North Dakota Workmen's Compensation Bureau, supra*, 171 N.W.2d at 110–112.

"4.

"The profit to Power Fuels from the buy-sell transaction is the difference between the purchase and selling prices. No specific charge is made for transportation, and the prices of the transaction, originally determined competitively, are now controlled by the Federal Energy Administration.

"5.

"The magnitude of the profits accruing to Power Fuels from the buy-sell operation are not ascertainable from the record.

"6.

"Under the Temporary Authority granted by the Public Service Commission, Power Fuels has been engaged in a satisfactory common carrier transportation of crude oil and water for Wiser Oil, Phillips Petroleum, Murphy Oil, Ward-Williston, Zinke and Phillipe, utilizing three trucks and three trailers stationed at Minot, North Dakota.

"7.

"As of June 30, 1977 the Applicant Power Fuels had assets of $226,903 and liabilities of $126,320, with $100,583 of Shareholder's equity. The American Bank and Trust Company of Minot, North Dakota, is willing to provide the necessary financing for additional transportation equipment, should Power Fuels so request.

"8.

"A dramatic increase in the exploration and drilling of oil wells has occurred within North Dakota recently. As of June, 1977 there were 35 drilling rigs in operation, compared to 8 three years ago. 228 drilling permits were issued for the first six months of 1977, compared to 135 for the entire 1976 year. Wildcat discoveries in North Dakota are 20 percent over the national average.

"9.

"Ward-Williston Drilling Co. and Wiser Oil Co. sell crude oil to Ashland, Murphy, and Koch Oil Companies. Currently, Ward-Williston and Wiser, active in Bottineau, Renville and McHenry Counties, have 26 producing wells and maintain 5 salt water disposal plants. Although they utilize the services of Matador, as well as that of the Applicant Power Fuels, Ward-Williston and Wiser are dissatisfied with Matador. Matador has damaged two disposal plants by mixing crude oil with the water delivered there for disposal. Matador leaves the run tickets at the lease site, and refuses to haul tank bottoms. Matador is a subsidiary of Koch Oil, which is a competing oil buyer in the strongly-competitive North Dakota oil industry. Ward-Williston and Wiser support the Applicant's application for crude oil and disposal water hauling authority.

"10.

"Gulf Oil Corp., currently active in Dunn, McKenzie and Billings Counties, has 23 producing wells. Gulf has six drilling rigs in North Dakota and is planning to drill 50 wells in the next year. Because of the geology attendant in the area of new drilling in North Dakota, salt water is an important ingredient in the process of oil drilling. Gulf currently is utilizing Getter and Matador to transport the salt water it uses for drilling, but these carriers have not fulfilled all of Gulf's transportation needs. Although there is presently a shortage of salt-saturated water, there being but one plant producing it, a drilling rig requires the services of six trucks to provide the necessary drilling water. Thus, the daily demand for salt water transport fluctuates with the completions of particular drilling activities. Gulf supports Power Fuels' application for salt water authority.

"11.

"Galaxie Oil Company operates wells in Renville and McKenzie Counties. Galaxie currently utilizes Matador, Getter and Power Fuels, and finds the services of all three satisfactory. Galaxie sells its crude oil to Ashland, Koch and Murphy Oil Companies.

"12.

"Phillips Petroleum has 82 producing wells in the Westhope area, 7 producing wells around Dickinson, and 2 others in western North Dakota. It is presently drilling 5 wells in the Westhope area. Phillips has had problems with Matador drivers allowing disposal water receiving tanks from its producing wells being allowed to overflow. Phillips supports the application

of Power Fuels, insofar as it pertains to the authority to transport drilling and disposal waters.

"13.

"Gulf Oil and Phillips Petroleum are each partners in certain action with Sunbehm Gas, a company related by common stockholders to Power Fuels.

"14.

"Matador Service, Inc., a subsidiary of Koch Oil which is, in turn, a division of Koch Industries, holds the following North Dakota intrastate authority:

"1. Petroleum products in bulk and equipment, materials and supplies used in drilling and exploration for oil and gas from, to and within all of Stark County and that portion of Dunn County lying south of Highway No. 7, excluding the towns of Killdeer, Dunn Center, Werner, and Halliday.

"2. Crude oil and water in bulk in tank vehicles between all points and places on and west of North Dakota Highway No. 1 in the State of North Dakota.

"3. Crude oil and water in bulk used in drilling and exploratory operations between all points and places east of North Dakota Highway No. 1.

"15.

"Matador, which also holds transportation authority in Kansas, Oklahoma, Montana and South Dakota, maintains terminals in North Dakota at Lignite, Westhope, Watford City, Tioga, Williston, Belfield and Bowman. Transportation equipment is stationed at the first four terminals, totaling 55 trucks with tanks and 37 pup trailers.

"16.

"Eighty percent of Matador's system revenues come from transportation of oil and water in North Dakota. Matador experiences competition from Northern Tank Lines and Getter, although the former is only in crude oil in the Tioga area, and the latter is in water only.

"17.

"As oil field activity has increased in the past three years, Matador has increased its investment in North Dakota.

"18.

"Getter Trucking, Inc. is a company in the business of oil field hauling, holding North Dakota intrastate authority as follows:

"OIL DRILLING AND DEVELOPMENT EQUIPMENT, PARTS AND SUPPLIES: Between Williston and the surrounding area on the one hand, and other points and places in the State of North Dakota on the other; and between other points and places in North Dakota where petroleum exploration work is carried on or will be carried on.

"19.

"Getter has one terminal in Williston, North Dakota, at which it maintains 14 trucks and trailers, some of which are used in Montana. North Dakota revenues from the transportation of oil field liquids accounts for only 20–25 percent of Getter's North Dakota business, and only 3.75–4.69 percent of its system revenues.

"20.

"Northern Tank Lines is a transportation company which holds the following pertinent North Dakota intrastate authority:

"EXTENSION TO INCLUDE THE HAULING OF WATER: From, to and within Burke and Mountrail Counties and that portion of McKenzie County lying south of Hwy. No. 23.

"CRUDE OIL in tank trucks: From, to and within the Counties of Billings, Golden Valley, Burke, Mountrail and that portion of McKenzie County lying south of Hwy. # 23.

"21.

"Terminals located at Williston and Tioga maintain 13 trucker-trailer units which are utilized for intrastate crude oil and water hauls. Very little water is transported by Northern in the Tioga area.

"22.

"Northern utilizes winter crude oil hauling to balance its interstate asphalt transportation.

"23.

"Big 'M' Oilfield Service, Inc. holds the following North Dakota intrastate authority:

'Transportation, in high pressure pump trucks and vacuum trucks, of fluids incidental to maintaining and servicing of completed and producing oil and gas wells in Bowman and Slope Counties, North Dakota,

'EXCLUDING the general hauling of drilling fluids, water, crude oil and other items.'

"AMENDED CONCLUSIONS OF LAW

"1.

"The Public Service Commission has jurisdiction over the proposed activities of the Applicant and the subject matter of this proceeding.

"2.

"Applicant Power Fuels is fit, willing and able to perform the service for which authority is sought. The record herein does not establish Power Fuels to be engaged in illegal transportation. While further hearings might so prove, the Commission concludes that such activity would not, in this case, prevent the grant of the authority sought, when weighed against the benefits obtaining to North Dakota shippers from the grant.

"3.

"The significant increase in oil field activity in North Dakota in the past three years has resulted in a need for additional common carrier authority.

"4.

"The authority sought in the instant application is irregular route, as is the author-

ity of the competing carriers. Consequently, no conclusion can be drawn with respect to existing travel upon specific routes. No significant increase in the cost of maintaining the highways concerned will result from a grant of this application.

"5.

"Existing transportation facilities in the territory for which the Applicant seeks authority are not providing a reasonably adequate service, nor does it appear from the evidence that they could furnish such adequate service. Security of investments does not foreclose a grant of competitive authority, where the dramatic increase in demand for transportation services has not been adequately met.

"6.

"Public convenience and necessity require the grant of the instant application."

Testimony was presented to the Commission by four potential users of the service that Power Fuels seeks to offer. In addition, testimony was offered that indicated a substantial upsurge in oil exploration and production in this State in the immediate future.[6] Matador, in its presentation to this court, has analyzed this testimony and has attempted to discredit much of it. It notes that Wiser Oil Company, although complaining of the service then offered by Matador in hauling crude oil, did not actually transport the oil; that, instead, those companies purchasing the oil from Wiser were responsible for its transportation and none of those companies was called to testify by Power Fuels. Matador also notes that the dissatisfaction felt by Wiser and Ward-Williston Drilling with the transportation by Matador of disposal water from producing wells would not be corrected by Power Fuels's certification. Power Fuels also intended to haul the disposal salt water in tanks that were used to transport crude oil, and Matador's use of tanks to haul both crude

6. While it could not be part of the record made before the PSC in September 1977, the forecast of the increase in oil and gas exploration and production in this State was, in fact, correct and is now common knowledge.

oil and salt water was the basis of its customers' dissatisfaction.

Gulf Oil Company's representative, who also supported the application of Power Fuels, testified that Gulf's dissatisfaction with existing service was due to the unavailability of salt water for drilling purposes. Matador's witness testified this problem existed because of the short supply of salt water and not because of the lack of transportation facilities in which to haul the salt water.

Phillips Petroleum Company was also interested primarily in the water transportation service. It complained that Matador had permitted its receiving tanks to overflow, although it also admitted that the service had been adequate with only one or two exceptions.

Galaxy Oil Company stated Matador's salt-water transportation service had been satisfactory, although it expressed support for Power Fuels's application.

Power Fuels and the PSC view the evidence as sustaining the PSC's conclusion that public convenience and necessity require the granting of the certificate of authority. They point out that only Matador provides the complete oil field service that Power Fuels seeks to provide. Although there were other protestants at the hearing before the PSC, only Matador appealed to this court the order granting Power Fuels that authority, and none of the other protestants has as broad authority as Matador holds or as Power Fuels seeks to attain. They also note that Wiser Oil Company sells crude oil to three companies (Murphy, Ashland, and Koch), that Matador is a subsidiary of one of these companies (Koch), and that Ashland and Koch are probably engaged in crude oil production trades. PSC and Power Fuels argue that it is improbable that Koch or Ashland would testify against Matador in view of these arrangements between them.

Concerning the testimony that both Matador and Power Fuels were to transport salt water in the same tanks in which they transported crude oil (to which Wiser Oil Company and Ward-Williston Drilling objected), the PSC argues that transportation in separate tanks might well be accomplished by competition between Matador and Power Fuels if separate vehicles for such transportation is realistic. The PSC and Power Fuels urge that Matador's "complacency," to which Phillips Petroleum had testified, might also be corrected by competition. Finally, they note that while Matador has attempted to place the blame for the lack of salt water that Gulf Oil Company desired for drilling purposes on the unavailability of the salt water rather than on a lack of transportation facilities for the salt water, the evidence shows that neither Matador nor Getter, which also had authority to transport salt water in the area in which Gulf was drilling, could "keep up to the rigs" that were then drilling and that Getter had denied a request for service because of lack of vehicles.

■ Thus the basic issue that surfaces in this appeal is whether the record must reflect that the service furnished or that could be furnished by holders of an existing certificate of authority is not reasonably adequate before an additional certificate of authority may be granted to an applicant. Matador's position appears to be that the evidence must show that the service they furnish is unsatisfactory in order to justify the issuance of an additional certificate of authority by the PSC. We do not agree.

In *In re Hanson*, 74 N.D. 224, 239, 21 N.W.2d 341, 349 (1945), this court, on rehearing, considered the provisions of what is now Section 49–18–14, N.D.C.C., prohibiting the issuance of a certificate of authority if it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, and stated:

"[T]he commission is not confined to the immediate present. It must have a broad view and a far look and though public necessity and convenience may seem to be somewhat trivial at first, to the com-

mission charged with the duty of oversight it may appear conditions were so shaping themselves there is a growing demand now and for the immediate future and thus the commission be required to make provision therefor. It is not merely the necessity for the next day; but for the morrow which governs the commission."[7]

In *Application of Ditsworth*, 78 N.D. 3, 48 N.W.2d 22 (1951), this court, on appeal from a decision of the PSC, considered the effect of an amendment of Section 49–18–08(4), N.D.C.C. That section, prior to its amendment in 1945, required the PSC to "Prevent substantial duplication of service between common motor carriers . . ." The 1945 amendment of that section required the PSC to "Prevent unfair competition between common motor carriers . . ." The court noted that the amendment meant that substantial duplication of service alone no longer prevented the issuance of a certificate. The court further stated:

"The amendment of Section 49–1808, RCND 1943, which we have heretofore noted, indicates an intention on the part of the legislature to depart from the policy of controlled monopoly in the field of transportation and permit motor carrier competition under the control of the Public Service Commission within the limits prescribed by the statutes. The most important factor of limitation is the adequacy of existing transportation facilities prescribed by Section 49–1814, RCND 1943.

"Whether existing transportation facilities under the facts shown are or can be made reasonably adequate to meet the requirements of public convenience and necessity is primarily an administrative question. [Citations omitted.] When an appeal from the Public Service Commission taken pursuant to the provisions of the Administrative Agencies, Uniform Practice Act, Chapter 28–32, RCND 1943, reaches the supreme court for review, it tries the case anew upon the record, not as an administrative body exercising administrative discretion but as a court exercising judicial powers. [Citation omitted.] The evidence in this case, while conflicting sustains the determination of the Public Service Commission that the public convenience and necessity will be served by the granting of the respondent's application and that the service now rendered or that could be rendered by the appellants is not reasonably adequate." 78 N.D. at 8–9, 48 N.W.2d at 25–26.

See also *Application of Hvidsten*, 78 N.D. 56, 48 N.W.2d 26 (1951).[8]

■ Finally, Matador argues that the PSC's conclusion that Power Fuels "is fit, willing and able to perform the service for which authority is sought" was in error because Power Fuels has been transporting liquefied petroleum gas (LPG) without a certificate of authority. The findings of the PSC indicate that Power Fuels did transport LPG without a certificate. The PSC also determined that Power Fuels buys the product at the loading point and sells it at the delivery point; that the profit of Power Fuels from the buy-sell transaction is the difference between the purchase and selling prices; that no specific charge is made for transportation; and that the

**7.** It is interesting to note that in *Hanson* the court affirmed a PSC decision granting a certificate of authority and that the standard of review then applied by the court was a "preponderance of the evidence."

**8.** These statutes have not been subsequently amended and the construction placed upon them in *Ditsworth* and *Hvidsten* still applies. One of the members of the PSC attached to the order of the PSC granting Power Fuels the certificate of authority a "Special Concurring Opinion" in which he indicated that he was not advocating a full retreat to unregulated competition but rather suggesting that "Regulated competition is the end sought—utilizing the self-interests of the carriers to assist in the Commission's obligation to regulate, rather than working toward a division of the market."

With regard to the statement concerning trial anew, see *Geo. E. Haggart, Inc. v. North Dakota Workmen's Compensation Bureau, supra.*

prices of the transaction, originally determined competitively, are now controlled by the Federal Energy Administration.

The conclusion of the PSC that is most significant in this regard is that such activity was not illegal on the basis of the record before it, and that even if the activity were illegal it would not prevent the granting of the authority sought when weighed against the benefits North Dakota shippers would obtain from the granting of the certificate.

The leading case cited by all parties is *Eklund Brothers Transport, Inc. v. Ritts*, 148 N.W.2d 263 (N.D.1966). In that case the PSC issued an order to certain respondents requiring them to cease and desist their operations transporting water as for-hire motor carriers within the State of North Dakota until they had complied with the applicable provisions of Chapter 49–18, N.D.C.C., and the rules and regulations of the PSC. The record made on the hearing before the PSC showed that the respondents were transporting water to oil-drilling sites without a certificate. The respondents contended they did not need a certificate because they purchased the water at the loading point and sold it at the well site and, under the provisions of Section 49–18–02(1), N.D.C.C.,[9] they were exempt from the requirement of a certificate of authority. This court upheld the order of the PSC, concluding that the respondents were not bona fide owners of the water they transported, but, rather, they were primarily engaged in transportation because the water was purchased only for immediate transportation and delivery to customers. The court relied upon factually similar Federal decisions construing Federal law relating to the regulation of motor-carrier transportation in interstate commerce that dealt with facts similar to those in *Eklund*.

The PSC argues that the Federal decisions have adopted the "primary business"

test and that, because *Eklund* relied upon Federal decisions, we have impliedly adopted that test. The PSC points out that the "primary business" test is a determination whether or not the furnishing of transportation for compensation, as distinguished from some bona fide merchandising or manufacturing enterprise, is the carrier's real business. The PSC then notes that the United States Department of Energy recognizes the existence of a defined business known as "crude oil reselling," regulates the profit margins of this business, and specifically concerns itself with the type of crude oil reseller who buys from the producer and transports directly to the point of sale without having passed through any point of reception. Thus, the PSC argues, there is a distinction between crude oil resellers who exist as a business and water resellers who, to the PSC's knowledge, do not exist as a business.

This is a question that, from the record made before the PSC, we cannot decide today. Rather, the conclusion of the PSC that such activity, if it were illegal, would not prevent the granting of the authority sought, is controlling. If we were to conclude that Power Fuels had transported LPG without a certificate, contrary to law, the question would still remain whether or not such activity would prevent the PSC from granting a certificate of authority to transport other commodities. This is a matter peculiarly within the discretion of the PSC. Because the PSC's conclusion is within its discretion, and because of the record before the PSC, we will not substitute our judgment for that of the PSC on this appeal.

■ In reviewing the construction placed upon the statutes authorizing the PSC to issue a certificate of public convenience and necessity (particularly insofar as the statutes concern the authority of the PSC to

---

9. Section 49–18–02, N.D.C.C., provides, in part: "The provisions of this chapter shall not apply:
 "1. To any person transporting his own property with his own vehicle when such per-son is the bona fide owner of the property so transported."

look to the future), the intent of the Legislature to depart from the policy of controlled monopoly in the field of transportation, the evidence of future growth in oil exploration and production in North Dakota, the dissatisfaction felt by users of the current service, and the PSC's conclusion that the past activities of Power Fuels would not bar its receiving a certificate of authority, we conclude that the PSC's finding that public convenience and necessity require the granting of Power Fuels's application was supported by a preponderance of the evidence.

For the reasons stated herein the judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.