Ronald L. REYNOLDS, Appellee,

v.

**NORTH DAKOTA WORKMEN'S COM-
PENSATION BUREAU, Appellant.**

Civ. No. 10201.

Supreme Court of North Dakota.

Dec. 17, 1982.

Hartelius & Associates, Great Falls, Mont., for appellee; argued by Randall Skorheim.

Joseph F. Larson II, Asst. Atty. Gen., Workmen's Compensation Bureau, Bismarck, for appellant.

SAND, Justice.

Ronald L. Reynolds [Reynolds] filed a claim with the North Dakota Workmen's Compensation Bureau [Bureau] for an injury to his neck and back allegedly sustained, on 26 May 1979, while working for Cardinal Drilling Co. in Billings County, North Dakota. The Bureau denied the claim and Reynolds requested and received a rehearing after which the Bureau reaffirmed its denial and dismissed the claim. Reynolds appealed to the district court which reversed the Bureau's determination, and the Bureau appealed to this court.

On appeal to this Court we review the findings and decision of the Bureau rather than the findings and decision of the

district court. *Robert v. North Dakota Workmen's Compensation Bureau,* 321 N.W.2d 501 (N.D.1982); *Steele v. North Dakota Workmen's Compensation Bureau,* 273 N.W.2d 692 (N.D.1978).

Prior to discussing the factual circumstances surrounding Reynolds' claim, it will be helpful to note that a claimant has the burden of proving by a preponderance of the evidence that he or she is entitled to participate in the benefits available from the Bureau. North Dakota Century Code § 65–01–11; *Robert v. North Dakota Workmen's Compensation Bureau, supra.* The claimant must establish that the injury was incurred in the course of employment and that the disability is causally connected to the employment injury. *Robert, supra.*

According to Reynolds' testimony,[1] the injury to his neck and back allegedly occurred when he slipped on the rig floor and landed on his back. Reynolds described the incident as follows:

"A. Well, I suppose I should go into detail, but—Our number one motor was down—out of commission. We had an engineer from Billings up there to help us fix it. We were helping this guy fix this motor and we had to replace the clutch and the oil-cooling system on it, and I was on the other side of the draw works, and I came across the rig floor across the roof, bypassed the rotary table, and I was jumping down off the floor. The floor is split level from our working floor down to the level that our motor sits at.

"Q. Okay. What was the difference in height between the two levels? —the best you can recall?

"A. A foot-and-a-half; two feet at the most.

"Q. Okay. Go ahead.

"A. And when I jumped down, my feet just went out from underneath me. The floor was a bloody mess, as it always is, and I just picked myself up.

"Q. What part of your body did you fall on?

"A. It was my right side, but it was just pretty much flat on my can, you know, and just kind of whiplashed my neck is what had happened when it hit the back of the floor that I just stepped down off of.

"Q. How did you feel immediately after you fell? Did you feel any pain?

"A. Nothing severe. I had a little twinge when I got up and I stood on my feet, but that was it."

Reynolds also testified he reported the incident to the foreman, Calvin Thayer, in the presence of the other members of the crew. However, Thayer and the crew members sent a memorandum to Cardinal Drilling which, in substance, stated that they "knew nothing of the supposed accident until around 2 wks. after when we were told of it in a bar in Glendive."

Reynolds testified that one of the crew members, Martin Doll, was in a position to see the slip and the fall. Doll testified in his deposition as follows concerning his observations:

"A. I remember I was standing off the floor and he was coming back around. I don't remember exactly what it was for. And I don't know if he kicked the table or whatever, I just turned around as he had slipped and caught himself.

"Q. How did he catch himself?

"A. With his hand, I think. I'm not sure, really, but he caught himself before he hit the ground.

"Q. So, he was stooped over somewhat?

"A. Yes, somewhat. But, he wasn't, I mean as far as being hurt, I don't know how he could have gotten hurt, because I asked him, I said, 'Are you all right?' He said, 'Yes, I am.' I said, 'All right. Just making sure.' That was all that was ever heard about it for me.

"Q. You didn't see him hit his head on the deck?

"A. No, he didn't hit his head. I know that.

1. Reynolds and his girlfriend, Carol Deines, testified at the hearing before the Bureau. Additionally, depositions of Martin Doll, Calvin Thayer, and David G. Leonhardt were made part of the record before the Bureau through a stipulation of the parties.

"Q. His neck?

"A. No.

"Q. His back?

"A. No.

"Q. His butt?

"A. No.

"Q. See any of that?

"A. No, I didn't see it. Right off-hand, I couldn't see.

"Q. Mr. Reynolds testified that he fell directly on his tailbone that day. You didn't see that?

"A. No, I didn't.

"Q. So, he tripped, caught himself, remaining, basically, erect?

"A. Yes.

"Q. And you said to him, 'Are you hurt'?

"A. Yes.

"Q. And he said, 'No'?

"A. He said he was all right.

"Q. Did he discuss any pain with you, or any injury, at any time?

"A. None whatsoever."

The record contains a "No-Accident Certification Record" for 26 May 1979 with Reynolds' signature. The No-Accident Certification Record certified that the signers had not suffered any injury nor had an accident during their shift.

After completing their shift, the crew members went drinking at a bar. The record reflects that nothing was said about Reynolds' injuries at this time. Reynolds testified that after leaving the bar he drove home with his girlfriend and at this time began experiencing pain in his neck and back. Reynolds further testified that the pain got considerably worse and that he was unable to go to work the next day or at any time thereafter.

Thayer testified in his deposition that he went to Reynolds' house to pick him up for work on 27 May 1979 (the day after the alleged accident) and that no one answered the doorbell. Thayer further testified that he looked in the window and saw Reynolds and his girlfriend.

On 30 May 1979 Reynolds went to Paul Keilman, a chiropractor in Glendive, Montana. Reynolds ultimately saw three doctors during the summer of 1979 and surgery was performed on Reynolds' neck and back by Dr. Walton on 17 October 1979.

On 11 June 1979 Cardinal Drilling was notified by Reynolds of his injuries. Reynolds filed a claim with the Bureau on 10 September 1979. Reynolds' claim described the accident as follows: "I was walking from drawworks area to the top of dog house (drillers house) and slipped in oil, landing on my back." Reynolds' claim also stated, in response to the question, "time quit work due to accident," that he "didn't finish shift." However, Reynolds testified before the Bureau that he completed his shift on the day of the alleged accident. Cardinal Drilling filed a letter of "disapproval" with the Bureau concerning Reynolds' claim. The Bureau dismissed Reynolds' claim on 21 January 1980. However, pursuant to request, a hearing was held on the claim on 20 May 1980, and on 8 July 1980 the Bureau reaffirmed its order dismissing Reynolds' claim. Reynolds appealed to the district court and the district court reversed the Bureau's decision because it concluded "there simply is no credible evidence to support the findings of fact upon which that decision is predicated." The Bureau appealed to this Court.

Our scope of review of the Bureau's decision is governed by NDCC § 28–32–19 and we must affirm the decision of the Bureau unless its findings of fact are not supported by a preponderance of the evidence or its conclusions of law are not supported by its findings of fact.

■ The "preponderance of the evidence" standard has been defined as "evidence more worthy of belief" or "the greater weight of the evidence" or "testimony that brings the greater conviction of truth." *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 219 (N.D.1979).

In this instance the claim rests primarily, if not solely, upon Reynolds' testimony. The other evidence in itself does not support the claim. If anything, it rests upon Reynolds' statements. The Bureau has the

responsibility and duty to pass on the credibility of witnesses, including the claimant, and to weigh the testimony with other evidence presented and made part of the record. The evidence establishes that Reynolds injured his back and neck; however, the critical question is whether or not the injury was incurred in the course of his employment and that the disability was causally connected to the employment injury.

Reynolds' testimony regarding the day of the alleged injury was inconsistent and vague, particularly regarding signing the No-Accident Certification Record certifying that he did not sustain an injury on 26 May 1979, and that he twice asked Thayer to file an accident report, which Thayer stated was not true. There was no evidence that he was coerced or forced to sign the No-Accident Certification Record. In his words, he signed the report just to get the heck out of there.

Thayer's and Doll's depositions reflect that the members of the crew, including Reynolds, went drinking after work on the date of the alleged injury and Reynolds did not mention or complain to them about the injury. The next morning Thayer knocked on Reynolds' apartment door but Reynolds did not answer the door. Thayer stated that he observed Reynolds through the window. According to Cardinal Drilling's safety director, the injury was not reported to Cardinal Drilling until 11 June 1979. Reynolds' claim to the Bureau and "Compensation and Medical Expense Claim" stated the time of accident was "7:30 P.M. didn't finish shift." However, Reynolds testified before the Bureau that he worked until the end of the shift.

The record contains a letter from the treating physician who operated on Reynolds. That letter in substance related that, if the facts given to the doctor by Reynolds were correct, there was "no question as to the cause and effect relationship between his fall on the drilling rig floor and his subsequent fracture and surgical procedure

necessary to correct same." As we have previously noted, the testimony of Reynolds and Martin Doll's observations of the incident varied. Reynolds testified that he fell on his "can" and his neck "whiplashed . . . when it hit the back of the floor that I just stepped down off of." Martin Doll saw Reynolds slip and stated that Reynolds "never fell down on the floor completely . . . he caught himself before he hit the ground." [2]

■ Although Reynolds' testimony before the Bureau and Doll's deposition both relate that an incident of some type occurred, the different versions of the incident could cast doubt on the credibility of Reynolds. When these different versions are coupled with the previously set out documented inconsistencies in Reynolds' actions as to the day of the incident and particularly in signing the No-Accident Certification Record, we believe the Bureau could discredit Reynolds's testimony.

We are not suggesting that a claimant must immediately know the extent of an injury. We recognize the difference between reporting an injury (a happening or event) and the extent of the injury. Rather, we believe the circumstances of the case could lead the Bureau to conclude that Reynolds was being less than truthful in asserting that his injuries were caused by the incident at work.

In this instance there are inconsistencies between Reynolds' testimony and other evidence in the record. The Bureau had a right to take all of these inconsistencies into consideration in determining and weighing the evidence, particularly the testimony of Reynolds. If the Bureau, upon the foregoing evidence, decides to discredit Reynolds' testimony under the principles of law stated earlier herein, we are in no legal position to conclude that the Bureau erred in doing so. Taking into account the inconsistent testimony and circumstantial evidence in this case, we are not in a position to legally conclude that the Bureau's findings of fact

---

2. There is no medical evidence in the record before us as to whether or not Reynolds' injuries could have been caused by the incident as related by Martin Doll.

are not supported by the preponderance of the evidence.

After reviewing the record before us, and giving deference to the opportunity of the Bureau to observe the testimony of Reynolds and weigh its credibility, we conclude that the Bureau's findings of fact are supported by the preponderance of evidence and that its conclusions are sustained by the factual findings.

The decision of the Bureau dismissing Reynolds' claim is affirmed and the district court judgment is reversed.

ERICKSTAD, C.J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.