**Dale E. ELLIOTT, Plaintiff and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Defendant and Appellee.**

**Civ. No. 880229.**

Supreme Court of North Dakota.

Feb. 10, 1989.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for plaintiff and appellant; argued by Steven L. Latham.

Dean J. Haas (argued), Asst. Atty. Gen., North Dakota Workers Compensation Bureau, Bismarck, for defendant and appellee.

MESCHKE, Justice.

We consider the extent of Workers Compensation benefits for an injury when recovery may have been prolonged by a prior and partially non-compensable impairment. We reverse proration of benefits because the impairment was not "disabling."

Dale E. Elliott, a 35 year old machine welder at Melroe Company in Bismarck, had his right wrist crushed by machinery in September 1986. When he sought benefits, the North Dakota Workers Compensation Bureau awarded all benefits "on a fifty percent aggravation basis." Elliott

---

was reimbursed for only half of his medical expenses and was paid only half of the scheduled disability benefits. Elliott also then received half of the usual award for a partial and permanent impairment of his wrist attributable to both compensable and non-compensable, but preexisting, injuries.

Elliott appealed, seeking full medical and disability benefits. He did not appeal the award for his preexisting partial impairment. The district court affirmed.

On appeal to this court, Elliott sought full medical and disability benefits because his injury "was not related to any pre-existing condition but [only] ... the recovery time ... was prolonged [by] a prior physical condition." The Bureau conceded that "a normal wrist would have been injured" but argued that the "pre-existing impairment of the wrist has combined with the injury to produce a greater disability, and possible extended medical treatment." Since "[t]he work injury and the prior impairment have become entwined," the Bureau argued that "the prior impairment clearly contribute[d] to the current disability and medical expense." In this way, the Bureau justified its application of the "aggravation" statute, NDCC 65–05–15:

"*Aggravation of injury or disease— Compensation and benefits not paid for preexisting condition.* Compensation shall not be paid for any condition which existed prior to the happening of a compensable injury nor for any disability chargeable to such condition. In case of aggravation of a condition existing prior to a compensable injury and in case of the aggravation of a compensable injury by a nonemployment injury, compensation, medical or hospital expenses, or death benefits, shall be allowed by the bureau and paid from the fund only for such proportion of the disability, death benefits, or expense arising from the aggravation of such prior condition as reasonably may be attributable to such compensable injury. If the degree of aggravation cannot be determined, the percentage award shall be fifty percent of total benefits recoverable if one hundred percent of the injury had been the result of employment."

We interpreted this statute in *Balliet v. North Dakota Workmen's Compensation Bureau*, 297 N.W.2d 791 (N.D.1980). The Bureau concluded that Balliet's heart attack and death resulted from both his employment and a preexisting heart condition. When his doctor was unable to allocate cause, the Bureau applied NDCC 65–05–15 and awarded 50% of the usual benefits. We ruled that the word "condition" in the statute "does not allow the Bureau to prorate benefits in a case where the claimant had no previous impairment." We observed that "[p]utatively, almost every injury could, with sufficient scrutiny, be linked to some preexisting weakness or susceptibility." We construed the statute to refer to a preexisting condition "accompanied by an actual impairment or disability known in advance of the work-related injury" and "to disabling ones only." 297 N.W.2d at 794. Since Balliet's medical history "support[ed] a conclusion that *his work capacity was significantly impaired*" (our emphasis) by his prior heart attack, *Id.* at 796, we affirmed apportionment of both medical expenses and death benefits.

Elliott had a record of injuries to his right wrist, both compensable and non-compensable. He fractured his right wrist in a motorcycle-automobile accident in 1972, an injury not covered by workers compensation. In November 1976, while working for Melroe, Elliott tripped and fell, causing a "soft tissue injury" to his right wrist and hand for which the Bureau paid full benefits. In June 1977, while working for another employer, Elliott had an "undisplaced fracture of the little finger" on his right hand and the Bureau paid full medical benefits. In December 1977, while working at Melroe, Elliott fell, breaking a bone in his left wrist and bruising a shin.

On September 7, 1978, again while working at Melroe, Elliott injured his right hand. This time the Bureau apportioned benefits, paying only 50% because of the 1972 accident injury to his right wrist. Later in September 1978, to eliminate pain and distress from degenerative changes

and arthritis, Elliott had surgery on the right wrist at Mayo Clinic, a "scaphoid-trepezium-trapezoid" or STT fusion of 3 of 8 carpal bones in his right wrist. Dr. Miller, Elliott's doctor, testified in 1986 that the 1978 fusion resulted in a 25% reduction of normal range of motion as well as some loss of strength in that wrist. Later, in February 1979 Elliott bruised his right wrist and in March 1980 he sprained it, both while working at Melroe.

The 1986 injury at Melroe, from which this dispute arose, was a crushing one when a 38 pound pipe fell on his wrist. Dr. Miller testified:

"It was a contusing type of blow to the wrist, and I think that would cause a similar injury to a normal wrist or to Mr. Elliott."

Dr. Miller agreed that "a normal wrist [would] have suffered the same initial degree of injury." He went on to explain:

"I think the main difference is that the wrist joint is going to be more affected by the injury if it's not normal. It's going to maybe create more fluid formation, it's going to maybe create it to be limited in motion longer, it's going to give it a feeling of stiffness or of aching with weather change, and that type of thing, that can last or has a greater probability of lasting longer than a normal wrist, because a normal wrist has a greater ability to recover. It has a wider area of forgiveness than a less than normal wrist that has the same injury and doesn't have the tolerance for recovery that a normal wrist would."

Dr. Miller also testified that "we would expect him not to recover as quickly" from an injury after the degenerative changes and fusion, although "he's close to recovered back to the initial status of the wrist."

The Bureau found:

"[C]laimant's recovery period was prolonged by claimant's preexisting condition ... [which] was a prior impairment or disability known in advance of the work related injury which substantially contributed to claimant's current disability."

Concluding that "the degrees of causation cannot be determined," the Bureau ordered "a 50% aggravation award" of all benefits.

"To accept the Bureau's position," Elliott argued, "would be to agree that because of some underlying condition or problem which bears no relationship to the injury but which will prolong a claimant's period of recuperation as opposed to a 'normal person' entitles the Bureau to prorate all benefits." Conceding that prior injuries to his wrist justified apportionment of the partial impairment award, Elliott argued for separate scrutiny of the kinds of conditions "existing prior to a compensable injury" under NDCC 65–05–15. According to Elliott, only a prior disabling condition authorized apportionment of disability and medical expenses; a partial impairment of one member of his body, not disabling in itself, did not.. Since he was not disabled when he last injured his wrist, Elliott insisted that his disability and medical benefits should not be apportioned.

Elliott argued that the recent decision of the Court of Appeals of North Dakota in *Jepson v. North Dakota Workmen's Compensation Bureau*, 417 N.W.2d 184 (N.D. App.1987) supported him. The Court of Appeals reversed the Bureau's proration of permanent partial impairment benefits for a work-related dislocation of a claimant's shoulder where there was no evidence that the shoulder had been impaired by an injury in a non-compensable accident three years before the work injury. The Court of Appeals relied upon *Balliet, supra.*

Elliott pointed out that the Bureau had apparently paid all of Jepson's medical expense without proration, thus lending credence to Elliott's "separate-conditions" argument. In rejoinder, the Bureau pointed out that all benefits, including medical expenses, were apportioned in *Balliet, supra.*

There was unfairness in the Bureau's application of the "aggravation" statute to an injury like Elliott's, without demonstrating that his "work capacity was significantly impaired" as in *Balliet*. As Elliott pointed out, the medical expense for this injury to an impaired wrist was similar to that for

a normal wrist and "different persons suffering identical injuries will have their recuperative periods vary for many reasons...." The Bureau recognized the unfairness but excused it because no rule can be applied accurately where doctors can neither apportion cause nor predict the course of recovery with any certainty.

As we ruled in *Balliet,* not just *any* prior condition authorizes apportionment of benefits; it must be a "disabling" one which significantly impairs the work capacity of the claimant. In discussing "[p]rior nondisabling defect or disease not apportionable," one scholar has summarized this general approach to apportionment problems:

"Apart from special statute, apportionable 'disability' does not include a prior nondisabling defect or disease that contributes to the end result. Nothing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in states having special statutes on aggravation of disease, no attempt is made to weigh the relative contribution of the accident and the preexisting condition to the final disability or death. Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense." 2 A. Larson, Larson's Workmen's Compensation Law § 59.22(a) (1987). (Footnotes omitted).

And:

"The courts, for their part, have generally tempered the harshness of apportionment statutes whenever a doubt could be resolved in the direction of constricting their scope. One example is the ruling that apportionment applies only to permanent disability and not to temporary total." 2 A. Larson, Larson's Workmen's Compensation Law § 59.21, at 10–369 (1987). (Footnote omitted).

More than some impairment of a function is necessary; a disabling condition must be shown. While there was evidence of a modest impairment of the wrist, there was no evidence or finding that it was disabling in the sense that Elliott's work capacity was significantly impaired.

Therefore, we reverse the Bureau's proration of medical and disability benefits.

LEVINE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

In *Balliet v. North Dakota Work. Comp. Bureau,* 297 N.W.2d 791, 794 (N.D. 1980), we concluded that a preexisting condition "has to be accompanied by an actual impairment or disability known in advance of the work-related injury." Once having reached that conclusion, however, we further indicated that "Only questions of fact remain. Was Mr. Balliet's heart attack a work-related accident? And, if so, was there a preexisting disabling condition sufficiently established by the Bureau to serve as a basis for apportionment of medical expenses and death benefits?" 297 N.W. 2d at 796.

The majority opinion, after reciting that "More than some impairment of a function is necessary; a disabling condition must be shown," concludes that although there was evidence of a modest impairment of the wrist, "there was no evidence or finding that it was disabling in the sense that Elliott's work capacity was significantly impaired."

The evidence from an orthopedic surgeon was that the 1978 fusion resulted in a 25–percent reduction of normal range of motion as well as some loss of strength in the wrist. In response to a question from the Bureau's attorney as to whether Elliott had recovered and returned to the status prior to the September 19, 1986, injury, the doctor responded:

"He has called on occasion and said that he was having trouble at work with gripping and lifting and some aching in his wrist on occasion and by using a band around his wrist it helped, so he is having some symptoms since the injury. I have the impression from reading the records that he probably had some symptoms prior to the injury, so I think he's

close to recovered back to the initial status of the wrist."

The doctor also testified in response to a question as to the amount of injury to the wrist from the various incidents:

"I guess my opinion would be, from reviewing the entire record of the previous injuries, the Mayo Clinic treatment and X-rays that we have from two or three different sources, that there was a greater amount of residual from the initial injury and surgery than there was from the '86 injury."

The Bureau found:

"II.

"On the alleged date of injury the claimant was employed by Melroe Company as a welder.

.    .    .    .    .

"VI.

"On October 16, 1986, Dr. Miller reported that claimant had a previous fusion in the right hand in 1978. The physician further indicated that claimant had only seventy-five (75%) percent of normal motion prior to his most recent injury.

"VII.

"Dr. Miller stated that claimant had an aggravation of a preexisting injury in a less than normal wrist.   .

"VIII.

"At deposition, Dr. Miller testified that claimant's prior medical condition with the right hand would rate an impairment. There is also sufficient evidence that claimant was disabled as a result of the right hand injury in the past.

"IX.

"Dr. Miller further testified that claimant's preexisting hand condition was a substantial contributing factor in claimant's current disability. Dr. Miller testified that claimant's recovery time was somewhat prolonged by the preexisting condition.

.    .    .    .    .

"XII.

"There is no dispute concerning the matter [*sic*] in which claimant was injured. However, the Bureau does find that claimant's recovery period was prolonged by claimant's preexisting condition and that claimant's preexisting condition was a prior impairment or disability known in advance of the work related injury which substantially contributed to claimant's current disability."

In accordance with these findings the Bureau made the following conclusions of law:

"II.

"Claimant has a preexisting medical condition in the right hand which was a substantial contributing factor in claimant's current disability.

"III.

"Claimant's preexisting medical condition was an impairment and/or disability known in advance of this work related injury."

Because the issue of whether a preexisting disabling condition was sufficiently established to serve as a basis for apportionment is a question of fact, and, recognizing our standard of review of the evidence, i.e., whether or not a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record [*Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979)], it is difficult to reconcile the majority opinion. The undisputed evidence shows that Elliott was a welder and that prior to the 1986 injury he had 75 percent normal range of motion and had lost some strength in the wrist. It seems to me that a reasoning mind could, as the Bureau did, reasonably have determined that a welder who has lost 25 percent of the range of motion in a wrist he uses to weld has a preexisting condition "that was disabling in the sense that Elliott's work capacity was significantly impaired."

I can only reconcile the majority opinion by concluding that when the aggravation

statute is to be applied we now require specific and detailed findings as to the precise manner in which the preexisting condition was disabling in the sense that it significantly impairs the work capacity of the claimant.[1] Although no such specific requirements by this court have heretofore been announced in *Balliet*[2] or any other decision, I am willing to impose such a requirement in order to assist us in determining that the aggravation statute has not been used to reduce awards by applying it to *de minimis* preexisting conditions. Hence the Bureau or an employer should be forewarned that before relying on the aggravation statute they must show in detail how the preexisting injury had affected the claimant's work capacity; mere generalities in findings and conclusions will no longer suffice. It is also important to note we have not yet determined what is meant by a significant impairment of work capacity, i.e., is it qualitative or quantitative (and, if so, how much impairment is significant), or both? But that is apparently reserved for another case.

ERICKSTAD, C.J., concurs.

---

1. The Bureau emphasizes the evidence that indicates Elliott's recovery time will be somewhat prolonged by the preexisting condition. This finding appears to put the cart before the horse, for, absent a preexisting disabling condition sufficient to impair a claimant's ability to work, a preexisting condition which merely prolongs recovery time is immaterial. For example, age—a preexisting condition—might prolong recovery, i.e., older people do not recover as readily as younger people, but no one would seriously argue that age alone would justify application of the aggravation statute.

2. In *Balliet v. North Dakota Work. Comp. Bureau*, 297 N.W.2d 791, 796 (N.D.1980), we observed that "Balliet's medical history, even when considered by one untrained, is arguably sufficient alone to support a conclusion that his work capacity was significantly impaired." Elliott's history of wrist problems, as set forth in the majority opinion, may also appear to be "arguably sufficient alone" to support a conclusion that his work capacity was significantly impaired.