**James E. GRACE, Appellant,**

v.

**NORTH DAKOTA WORKMEN'S COMPENSATION BUREAU, Appellee.**

**Civ. No. 11232.**

Supreme Court of North Dakota.

Oct. 28, 1986.

Ohnstad, Twichell, Breitling, Rosenvold, Wanner, Nelson, Neugebauer & Maring, West Fargo, for appellant; argued by Ralph R. Erickson.

Dean J. Haas, Asst. Atty. Gen., North Dakota Workmen's Compensation Bureau, Bismarck, for appellee.

ERICKSTAD, Chief Justice.

James Grace appeals from a district court judgment upholding the North Dakota Workmen's Compensation Bureau's dis-

missal of his claim for benefits for injuries resulting from a heart attack he suffered during the course of his employment. We affirm.

James was employed for approximately six to seven weeks as the masonry foreman for Buckley Masonry on a project at North Dakota State University. James, as masonry foreman, was required to supervise brick laying and coordinate the masonry work with the other trades that were present on the job. In addition to his foreman duties, James spent approximately 75 to 80 percent of his employment time doing masonry work. James had 38 years of experience as a mason and during that time had occasionally served as masonry foreman. His last job as masonry foreman was approximately one year prior to his duties as foreman for Andy Buckley. At the time of his heart attack James was 60 years of age.

James testified that on the date of his heart attack, August 4, 1982, and for two days prior, the temperature at the work site had been very high. James and his crew were working on the second floor of a partially built building with outside walls but without any roof. James described the work site as "being in a big, open box with the sun shining directly in...." He estimated that at the particular place where he was working the temperature was probably close to 120°. James felt uneasy because his crew was about half a day behind schedule. He felt further anxiety because a crane was moved overhead which caused a potentially dangerous working condition and further delay to his time schedule.

On August 4, the day of his heart attack, between 10:00 a.m. and noon, James began to feel very weak. He became so weak that it was difficult for him to lift up the cement blocks that he was laying. He decided to go home. After he had been home for approximately ten minutes he became very ill and was taken to the hospital. On his admission to the hospital James was diagnosed as suffering from "[a]cute inferior myocardial infarction" and "[c]hronic obstructive pulmonary disease" by Dr.

Robert L. Geston. Dr. Geston, in his letter to James' attorney, described the cause of James' myocardial infarction in relevant part as follows:

"I believe that the heart attack suffered by James Grace on August 4, 1982 was caused, within reasonable medical certainty, by conditions under which he was working on the day of the event.

"In the first place, temperature conditions were extremely high. This causes a dilitation [sic] of his blood vessels in the skin which can reduce blood pressure. Excessive sweating depletes salt, potassium, and water from the circulation decreasing blood volume and sometimes disturbing electrolyte balance. He was also under extreme emotional stress due to pressures to complete a segment of construction so that other construction personnel could get underway. This stress often releases adrenalin which drives the heart and makes the heart increasingly irritable. All of these factors together would certainly lay the ground work for heart injury."

James filed a claim for Workmen's Compensation benefits on August 23, 1982. The Bureau denied him benefits finding that there was no medical substantiation that his heart attack was related to his employment with reasonable medical certainty. The Bureau also found that there was no evidence of unusual stress precipitating his heart attack.

James requested a rehearing. On January 5, 1983, the Bureau wrote to James and requested that he indicate what additional evidence he wished to present through the rehearing process. The Bureau received no response and again wrote to James, informing him that if the Bureau did not hear from him within 30 days, it would assume that he had no additional evidence to present. No response was received and the Bureau issued an order dismissing his claim on September 1, 1983.

■ James again requested a rehearing. A formal hearing was held on February 1, 1985. The Bureau issued an order reaffirming dismissal, based upon additional ev-

idence introduced at the hearing and its review of the entire file, on March 28, 1985.[1] The Bureau in its order reaffirming dismissal determined:

*"FINDINGS OF FACT*

"I.

"An application for workmen's compensation benefits was filed on August 23, 1982, in connection with an alleged injury on August 4, 1982.

"II.

"On the alleged date of injury the claimant was employed by Andy Buckley Masonry as a mason.

"III.

"The claimant suffered an acute inferior myocardial infarction.

"IV.

"The claimant alleges that his heart attack resulted due to working in humid, direct sunlight for several days.

"V.

"The claimant was performing the normal duties of his occupation and there is no evidence of unusual stress or strain.

"VI.

"The claimant has a history of cigarette smoking since age seven and smokes approximately one pack per day.

"VII.

"The claimant suffers from coronary artery disease and chronic obstructive pulmonary disease.

"VIII.

"There is no medical substantiation that the claimant's heart attack was in any way related to his employment with reasonable medical certainty.

*"CONCLUSIONS OF LAW*

"I.

"The claimant failed to prove an injury by accident arising out of and in the course of employment.

"II.

"The claimant failed to prove that the heart attack was precipitated by unusual stress in the course of employment.

"III.

"The claimant failed to prove that the heart attack was causally related to his

---

1. James argues that his statement taken by the Bureau's investigator violated the North Dakota Code of Professional Responsibility because his statement was taken without first contacting his attorney. James relies upon DR 7–104(A)(1) that mandates:

"(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

James did not object to the admission of his statement in the administrative hearing. In *Gramling v. North Dakota Workmen's Compensation Bureau,* 303 N.W.2d 323, 327 (N.D.1981), we held that when there was no obvious error, claimant's failure to object to evidence introduced at the administrative hearing did not properly present the question to the appellate court on review. James contends that the failure to object in this case must be considered plain error since his attorney in a letter sent to the Bureau previously objected to the statement. The letter reads in relevant part as follows:

"I must take this opportunity to object to the procedure you used to interview Mr. Grace. I was not notified that a private investigator would be contacting him. Had I been notified, I probably would not have objected to the interview, but I certainly would have been present to insure that Mr. Grace had an opportunity to fully explain the facts. Mr. Grace tells me that he was very nervous and confused during the interview and does not believe that the transcript of the interview is an accurate picture of the circumstances surrounding his heart attack. We hope we can clear up this situation at the hearing."

We do not think that receiving this statement rises to the level of plain or obvious error.

employment with reasonable medical certainty.

## "IV.

"The claimant failed to prove that he is entitled to benefits under the North Dakota Workmen's Compensation Act."

James appealed from the Bureau's decision to the district court. The district court affirmed the decision of the Bureau in a Memorandum Opinion on March 10, 1986. The district court found that James' heart attack was causally related to his employment with medical certainty, but upheld the Bureau's denial determining that he failed to prove that his heart attack was precipitated by unusual stress in the course of his employment. James appealed from the district court judgment to this Court.

■ In an appeal from a judgment of the district court involving the decision of an administrative agency, our review is limited to an examination of the decision of the agency and not the decision of the district court. *Skjefte v. Job Service North Dakota,* 392 N.W.2d 815 (N.D.1986); *Blueshield v. Job Service North Dakota,* 392 N.W.2d 70 (N.D.1986); *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D.1979). Our review of administrative decisions is directed by Section 28–32–19, N.D.C.C., and requires a three step process to determine: (1) If the findings of fact are supported by a preponderance of the evidence; (2) if the conclusions of law are sustained by the findings of fact; and (3) if the agency decision is supported by the conclusions of law. *Skjefte,* 392 N.W.2d at 817.

In *Skjefte,* this Court recently summarized the standards we use in reviewing administrative agency decisions, as follows:

"1. We do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could have reasonably determined that the factual conclusions were supported by the weight of the evidence.

"2. We exercise restraint when we review administrative agency findings.

"3. It is not the function of the judiciary to act as a super board when reviewing administrative agency determinations.

"4. We will not substitute our judgment for that of the qualified experts in the administrative agencies."

The philosophy concerning these limitations of judicial review articulated in *Power Fuels* and its progeny is found in *Geo. E. Haggart, Inc. v. North Dakota Work. Comp. Bur.,* 171 N.W.2d 104, 111 (N.D. 1969), (quoting 2 Am.Jur.2d *Administrative Law* § 612 at 453–54 (1962)):

"The general frame of the power of judicial review is to keep the administrator within the valid statute which guides him and keep him from unreasonable excesses in the exercise of his function, and to ascertain whether there is warrant in the law and the facts for what the administrative agency has done, the court being limited to questions affecting constitutional power, statutory authority, and the basic prerequisites of proof. The primary limitation upon the power of the court to review is in regard to matters calling for the exercise of expert judgment which are committed to the discretion of the administrative agency. Thus, judicial review is extremely limited in regard to findings of fact and to expert judgments of an administrative agency acting within its statutory authority. The courts must not usurp the functions of the administrative agency nor intrude upon the domain which the legislature has entrusted to the agency."

Section 65–05–05, N.D.C.C., provides for the payment of compensation and other benefits to employees who have "been injured in the course of their employment." The term "injury" as used in Section 65–05–05, has been construed by this Court to mean "compensable injury" as defined in Section 65–01–02(7), N.D.C.C. The relevant part of the definition that controls this case reads:

"If an injury is due to heart attack or stroke, such heart attack or stroke must be causally related to the worker's em-

ployment, with reasonable medical certainty, and must have been precipitated by unusual stress." Section 65–01–02(7), N.D.C.C.

Section 65–01–02(7) was amended by the North Dakota Legislative Assembly in 1977. The 1977 amendment reflects the legislative response to this Court's holding in *Stout v. North Dakota Workmen's Compensation Bureau,* 236 N.W.2d 889 (N.D.1975). In *Stout* we held that heart attacks occurring within the course of employment that were precipitated by *usual* exertion were compensable. 236 N.W.2d at 892.

The legislative history of the amendment indicates that, after *Stout,* claims for heart attacks increased significantly. Legislative Council, Standing Committee Minutes, 1977, S.B. 2158. Mr. Richard J. Gross, former counsel for the Bureau, testified before committee that the number of heart attack claims rose 500 percent after *Stout.* To substantially reduce a projected 17 percent increase in premiums resulting from *Stout,* the legislature enacted Senate Bill 2158 in the 1977 legislative session requiring that a heart attack or stroke be precipitated by *unusual* stress in order to be compensable. See Chapter 579, Sec. 2, 1977, N.D.Sess.Laws.

The "usual exertion" rule of *Stout* is no longer a correct statement of law. As we have stated previously, unusual stress "is now required by statute...." *Nelson v. North Dakota Workmen's Comp. Bureau,* 316 N.W.2d 790, 794 n. 2 (N.D.1982).

The dispositive issue on this appeal is whether or not the Bureau's finding that James' heart attack was not precipitated by unusual stress, is supported by a preponderance of the evidence. The Bureau has not contested the district court's determination that James' heart attack was causally related to his employment, with reasonable medical certainty, and, therefore, we will not review those findings on appeal.

■ In determining whether or not the Bureau's findings of fact are supported by a preponderance of the evidence, we are not free to substitute our judgment for that of the Bureau. Instead, our task is to determine "only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc.,* 283 N.W.2d at 220.

In reviewing the record we are mindful that the claimant seeking benefits from the Bureau has the burden of establishing his right to participate in the Workmen's Compensation Fund. Section 65–01–11, N.D. C.C.; *Claim of Bromley,* 304 N.W.2d 412, 415 (N.D.1981).

We are also mindful "that the Workmen's Compensation Act is to be liberally construed with the view of extending its benefit provisions to all who can fairly be brought within them." *Satrom v. North Dakota Workmen's Compensation Bureau,* 328 N.W.2d 824, 829 (N.D.1982). James concedes that the rule of liberal construction cannot be used as a substitute for proof; however, he argues that the Bureau arbitrarily selected evidence to give credence to its findings and that it ignored other relevant evidence. It is statutorily required that this Court affirm the decision of an administrative agency alleged to be supported by insufficient evidence unless "[t]he findings of fact made by the agency are not supported by a preponderance of the evidence." Section 28–32–19(5), N.D. C.C. *Satrom,* 328 N.W.2d at 831; *Inglis v. North Dakota Workmen's Compensation Bureau,* 312 N.W.2d 318, 322 (N.D.1981).

James argues that the coalescence of a number of stressful conditions occurring at the work site established by a preponderance of the evidence that his heart attack had been precipitated by unusual stress. James points to the high temperatures, unusual work duties as masonry foreman, emotional anxiety related to being behind schedule, and fear attributable to the movement of the crane overhead as creating unusual stress.

This Court has indicated that Section 65–01–02(7) does not require that the work causing the heart attack be different in

nature from the employee's usual work; however, it does require unusual stress. *Nelson,* 316 N.W.2d at 796. The Court in *Nelson* relied partially upon the Colorado Supreme Court's decision in *City and County of Denver v. Industrial Commission,* 195 Colo. 431, 579 P.2d 80 (1978). The Colorado court derived its unusual or extraordinary exertion test in part from *Schechter v. State Insurance Fund,* 6 N.Y.2d 506, 190 N.Y.S.2d 656, 160 N.E.2d 901 (1959). In *Schechter* the Court of Appeals of New York stated the appropriate test for unusual strain as follows:

"The phrase 'unusual or excessive strain', as sometimes used in describing these cases, is not so limited in its meaning as to include only work of an entirely different character from that customarily done. Simply stated, so long as the conditions of performing the work are such that an exceptional strain is imposed on the worker so great that his heart is affected and damaged thereby, the requirement of unusual or excessive strain is satisfied." 190 N.Y.S.2d at 660, 160 N.E.2d at 904.

Professor Larson explains unusualness as follows:

"[U]nusualness may be a matter of degree, not of kind. It may appear in the duration, strenuousness, distance, or other circumstances involved in the execution of routine assignments." 1B A. Larson, *The Law of Workmen's Compensation,* § 38.64(a)(9) (1986); *See also Chapman v. Wilkenson Company,* 222 Kan. 722, 567 P.2d 888 (1977); *Hamilton v. Procon, Inc.,* 434 Pa. 90, 252 A.2d 601 (1969).

We determined in *Nelson* that our examination for unusual stress must be applied according to the employee's complete work history. 316 N.W.2d at 796. The Bureau contends that in accordance with James' work history he was not under unusual stress. The Bureau points to James' 38 years as a brick layer and his work occasionally as a foreman. It relies upon James' testimony that he had been a foreman "off and on, my whole career of laying bricks." The Bureau notes that exposure to the elements is inherent in masonry work and that scheduling concerns are an integral part of being a foreman. The Bureau refers to the statement that James made to its investigator that being behind schedule was not anything to worry about. A part of the statement in question and answer form follows:

"O.K. had you been having problems with the job? Were you running ahead of schedule, behind schedule, over budget, under budget? You know, what problems, if any, did you have? Well we were running pretty well close to schedule. Ah, I set up the schedule myself. And ah, that last phase I was ah, half a day or a day behind. Half a day behind on my job.

"Is that anything significant, anything to worry about? Not really, no. It was, ah, well the biggest significance was that it ah, they were coming from Grand Forks with concrete, concrete slabs already made. And they lift those up with a crane. And they were ah, I had to have that done so they could set those concrete slabs up there.

"Did you get it done so they could do it? Yes."

There are substantial factual similarities between this case and *Nelson,* and also *Ganske v. North Dakota Workmen's Compensation Bureau,* 355 N.W.2d 800 (N.D. 1984). In *Nelson,* 316 N.W.2d at 791, the claimant's spouse (Aldean) died as a result of a heart attack that occurred during his employment as a lead truck driver and working foreman at a transport company. The claimant (Delores) conceded that Aldean was not under unusual physical stress at the time of his heart attack. Delores acknowledged that the evidence of physical stress, contributing to Aldean's heart attack, was his act of hooking up air hoses on his tractor-trailer. Delores, however, argued that Aldean was under unusual emotional stress related to his administrative duties and union tensions.

In *Ganske,* 355 N.W.2d at 801, the claimant (Hilda) suffered a heart attack while

employed as a kitchen helper for a school district. On the date of her heart attack, Hilda followed the normal routine for preparing and serving lunch which included chicken. Hilda testified that she felt more stress than usual on days she prepared chicken because she believed that the preparation of chicken required her to hurry.

In *Nelson* we noted the difficulty that courts in various jurisdictions have had in determining "unusual stress," particularly as applied to unusual emotional stress. We said:

> "Larson, in his treatise on *Workmen's Compensation Law*, page 7–202, notes that close questions involving emotional stress are inevitable when, instead of colorful triggering events, the employment contribution takes the form of a more protracted burden of worry, overwork, frustration, guilt, tension, or apprehension over losing one's job. After noting the many factual situations in which claims have been allowed or disallowed, the author, at page 7–217 of the treatise, notes that of all the categories of emotional causes of heart attacks and cerebral hemorrhages the poorest track record belongs to that of anger and excitement generated by work-connected arguments and fights. We have not read all the cases cited by Larson in his treatise. However, the cases we have reviewed indicate significantly more evidence of unusual emotional stress than is evidenced here." 316 N.W.2d at 797.

In the instant case, the stress is not attributed to anger and excitement generated by work-connected arguments and fights, but rather the emotional stress is attributed to worry and anxiety and the physical stress attributed to the extreme heat. The Bureau relies, however, on James' description of the day as a normal day. The questions and answers follow:

> "Q. As I understand it, you broke for lunch at noon?
>
> "A. At noon, yes.
>
> "Q. And you normally break for lunch at noon?
>
> "A. At noon, for half and hour.

"Q. For a half an hour. So on August 4th, as far as time was concerned, you didn't work any longer or any shorter than you normally do, as such?

"A. No. It was normal day.

"Q. Normal day. Except maybe you took a couple of short breaks because the crane was moving into position?

"A. Yes; but that's only maybe two—a couple of minutes, you know.

"Q. On August 4th did you lay any more brick or block than you normally lay?

"A. No."

Counsel for James, when asked during argument whether he would agree that James was performing normal duties, replied: "Yes, I would agree that the actual laying of the bricks is a normal duty of mason—it is impossible for me to dispute that contention." James relies primarily on the hot August weather as a condition to show unusual stress. Counsel during oral argument said that "the single most obvious factor is the heat." However, counsel conceded that masons must work in a variety of temperatures. Additionally, James testified in the administrative hearing that he had previously worked in very high temperatures. He said, "I've worked on boilers, and I've worked in temperatures exceeding 150 degrees...."

As we do not make independent findings of fact, but ask only whether or not a reasoning mind reasonably could have determined, as did the Bureau, that James' heart attack was not precipitated by unusual stress, we cannot say that the Bureau's findings concerning unusual stress were not supported by a preponderance of the evidence.

We conclude that the evidence supporting James' contention that his heart attack was precipitated by unusual stress is, as in *Nelson* and *Ganske*, not convincing enough to cause us to conclude that the Bureau's decision should be set aside.

The judgment of the district court is affirmed.

VANDE WALLE and GIERKE, JJ., concur.

MESCHKE, Justice, dissenting.

In *Weber v. North Dakota Workmen's Compensation Bureau,* 377 N.W.2d 571 (N.D.1985), we observed that while it is within the province of the Bureau to initially weigh and evaluate the evidence, it may not do so in an unreasoned manner. In *Weber,* we found it necessary to reverse and remand for consideration of evidence before it because it had failed to do so. We should again do so.

To qualify for workmen's compensation benefits, James Grace had to show (1) that his heart attack was causally related to his employment with reasonable medical certainty and (2) that it was "precipitated by unusual stress." N.D.C.C., § 65–01–02(7).

On the first statutory requirement, the Bureau declared that *"there is no medical substantiation that the claimant's heart attack was in any way related to his employment with reasonable medical certainty."* But, James' doctor stated that he believed the heart attack "was caused, within reasonable medical certainty, by conditions under which he was working on the day of the event." The doctor observed:

"In the first place, temperature conditions were extremely high. This causes a dilitation of his blood vessels in the skin which can reduce blood pressure. Excessive sweating depletes salt, potassium, and water from the circulation decreasing blood volume and sometimes disturbing electrolyte balance. He was also under extreme emotional stress due to pressures to complete a segment of construction so that other construction personnel could get underway. This stress often releases adrenalin which drives the heart and makes the heart increasingly irritable. All of these factors together would certainly lay the ground work for heart injury."

There was no contrary medical evidence.

On review, the district court concluded that there was "no doubt that [James'] heart attack was indeed causally related to his employment, with reasonable medical

certainty." This determination has not been seriously contested on this appeal.

On the second requirement, the Bureau declared, also sweepingly, that *"there is no evidence of unusual stress or strain."* But, there is obvious evidence of unusual stress on this job.

While the official temperature on August 4, 1982, rose to 93 degrees, James testified that it was about 120 degrees within the structure where he was working. James' employer agreed that it was extremely hot there and that conditions existed which "would certainly be unusual" for bricklayers' work. While the opinion by the Chief Justice minimizes heat as a factor, noting James' concession that he had once worked in temperatures exceeding 150 degrees, it still cannot be said that the temperature extreme in this case was a "normal" working condition. Indeed, in the instance that James had worked in 150 degree temperatures, he was able to take breaks every four or five minutes.

On this job, taking breaks was not a luxury James was allowed. Masonry jobs had been difficult to find, he had been unemployed for a long period before taking this job, and he was working as a foreman for only the second time in five years. Thus, he felt compelled to make sure that everything went smoothly. He was already a half-day behind schedule and was concerned that further delay would substantially increase his employer's expenses because a crew of men and a rented crane would remain idle until he finished the job.

Additional stress was created when the crane was positioned over the bricklayers' heads for use in the next phase of construction. The unsteady crane, swinging overhead, created a nerve-racking and potentially dangerous situation, forcing the bricklayers to suspend work to get out of the way several times.

Thus, there was clearly evidence of unusual stress, both physical and emotional. But the Bureau ignored it. Thus, we cannot fairly conclude that "a reasoning mind reasonably could have determined" that there was "no evidence of unusual stress

or strain," consistent with that formulation of our standard of review in *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D. 1979).

While there may be other evidence, as identified in the opinion of the Chief Justice, indicating that James was performing "normal duties" of his job, that evidence was neither identified nor weighed in the findings of the Bureau. Thus, it is obvious that the Bureau did not perform its duty of weighing the evidence on the requirement of unusual stress. On review, it is not our function to search the record for evidence to weigh. Nor, should we guess at what the Bureau might have determined if it had properly performed its duty to consider the evidence and to "make and state concisely and explicitly its findings of fact." N.D. C.C., § 28–32–13.

Nothing said or determined in *Nelson v. North Dakota Workmen's Compensation Bureau*, 316 N.W.2d 790 (N.D.1982) and *Ganske v. North Dakota Workmen's Compensation Bureau*, 355 N.W.2d 800 (N.D. 1984) compels a decision in favor of the Bureau in this case. In those cases, we noted the difficulty that courts have had in determining "unusual stress," particularly as applied to unusual emotional stress. In this case, evidence of the unusual stress resulting from a combination of physical and emotional factors must be considered. See, *e.g.*, *Nelson, supra*, 316 N.W.2d at 795–96, citing with approval *City and Cty. of Denver v. Indus. Commission*, 195 Colo. 431, 579 P.2d 80 (1978), which held that evidence of physical strain accompanied by emotional or mental tension was sufficient to support an award for a heart attack under the Colorado Workmen's Compensation Act.

The Bureau has not shown proper concern for the fair and just determination of James' claim. *Steele v. North Dakota Workmen's Compensation Bureau*, 273 N.W.2d 692, 702 (N.D.1978). It failed to consider evidence before it. *Weber, supra*, 377 N.W.2d at 574.

The evidence in this case does not support the Bureau's finding that there is "no evidence of unusual stress." Thus, its conclusions denying benefits are not properly supported by findings. Accordingly, we should reverse and remand for proceedings consistent with the evidence in this record.

Therefore, I respectfully dissent.

LEVINE, J., concurs.