Lee M. SCHMALZ, Appellant,

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee.**

Civ. No. 890269.

Supreme Court of North Dakota.

Dec. 20, 1989.

Evans & Moench, Ltd., Bismarck, for appellant; argued by Kenneth S. Rau.

Dean J. Haas (argued), Asst. Atty. Gen., North Dakota Workers Compensation Bureau, Bismarck, for appellee.

ERICKSTAD, Chief Justice.

Lee Schmalz appeals from a district court judgment upholding the North Dakota Workers Compensation Bureau's dismissal of his claim for benefits for injuries resulting from a heart attack he suffered during the course of his employment. We affirm.

Schmalz is a self-employed appliance, service, and refrigerator technician doing business under the name of Schmalz Appliance Service. He does his work in a garage which is approximately ten by twenty feet in size and twelve feet high. At the time of the heart attack, the garage did not provide for any fresh air ventilation.

Schmalz's work requires the use of an acetylene-oxygen torch to unsweat pipe connections. Some freon generally remains in the refrigeration tubing, and when heated, produces an odor and breaks down into a number of gases. The acetylene-oxygen torch also produces several gases including nitrogen dioxide and carbon monoxide. When reassembling the units, silver solder and cadmium flux are used which may produce gases when heated.

On November 29, 1984, Schmalz went into his shop at about 8:00 or 8:30 a.m. He began installing a compressor, using his acetylene torch, a task which is entirely usual and routine for him. He testified that he had been working on the compressor only minutes before experiencing chest pain. Schmalz sustained a heart attack, which was defined as death of heart muscle attributable to an inadequate supply of oxygen to the heart muscle.

Schmalz filed an application for workers compensation benefits on December 10, 1984. The Bureau dismissed the claim by order dated February 8, 1985. Schmalz failed to present any additional evidence and the order of dismissal was affirmed on December 10, 1986. He requested a formal hearing which was held on August 17, 1988. The Bureau issued an order reaffirming dismissal, based on additional evidence introduced at the hearing and its review of the entire record, on February 8, 1989. The Bureau, in its order reaffirming dismissal, determined:

"FINDINGS OF FACT

"I.

"Claimant filed an application for workers compensation benefits on December 10, 1984, in connection with an alleged injury on November 29, 1984.

"II.

"On the alleged date of injury the claimant was employed by Schmalz Appliance Service as an appliance repairman. Claimant was self-employed and has coverage under the Workers Compensation Act.

"III.

"Claimant indicates that he was replacing a compressor in a refrigerator when he sustained a heart attack on November 29, 1984. The heart attack occurred at approximately 9:30 a.m., on November 29, 1984.

"IV.

"The activity replacing the compressor was normal for the claimant and there is no evidence of unusual stress or strain.

"V.

"However, claimant contends that his heart attack was brought about by an exposure to gases in the course of his employment which reduced the ability of his blood to carry oxygen and resulted in the heart attack.

"VI.

"The evidence of record does indicate that as a result of using an acetylene torch on refrigeration equipment involving freon, and as a result of using cadmium flux, certain gases are emitted into the atmosphere including nitrogen dioxide, cadmium flux fumes, carbon monoxide, and possibly phosgene gas.

"VII.

"Evidence of record indicates that carbon monoxide and nitrogen dioxide combine more readily with the hemoglobin in the blood than does oxygen.

"VIII.

"Evidence of record indicates that if carbon monoxide and nitrogen dioxide gases are present in the atmosphere in sufficient quantities, the gases will mix with the hemoglobin in the blood reducing the ability of the blood to carry oxygen including to the heart muscle.

"IX.

"It is the opinion of Dr. Hinrichs, general practitioner,[1] that the claimant's exposure to carbon monoxide and nitrogen dioxide probably contributed to the heart attack as a precipitant.

"X.

"However, Dr. Hinrichs admitted that he was unaware of the quantities of carbon monoxide and nitrogen dioxide gases in the air where Mr. Schmalz worked. Dr. Hinrichs is also unaware of the carboxy-hemoglobin level of claimant's blood.

"XI.

"Claimant has proven that certain amounts of these gases are given off in the nature of using an acetylene torch working on freon. However, claimant cannot establish that these gases are present in sufficient quantities in the atmosphere to cause measurable or significant change in the carboxy-hemoglobin level of the blood. Therefore, Dr. Hinrichs' opinion that there may exist a cause and effect relationship between Mr. Schmalz' heart attack and the presence of these gases in the atmosphere is speculative since he assumes that the gases in the air were sufficient to materially affect the carboxy-hemoglobin level of the blood, even though the assumption cannot be reasonably made based upon available evidence.

"XII.

"Evidence is unavailable by which to determine whether the claimant's carboxy-hemoglobin level was such as to reduce the ability of the blood to carry oxygen.

"XIII.

The Bureau obtained the opinion of a cardiologist, Dr. Walter E. Frank. Dr. Frank indicates that approximately 90 percent of the individuals who suffer a heart attack have, as precipitating cause of the heart attack, the development of a blood clot which closes off an already narrowed blood vessel. There is no evidence that an exposure to these gases in any way leads the development of a blood clot.

"XIV.

"Dr. Frank indicates that it would be speculation to provide a medical opinion that presence of certain gases such as carbon monoxide and nitrogen dioxide in the air acts as the trigger to a subsequent heart attack without knowing whether the gases were sufficient in quantity to affect the carboxy-hemoglobin level of the blood thereby reducing the ability of the blood to carry oxygen. The physician indicates that absent this evidence he cannot make such a correlation between the gases in the air and the heart attack.

"XV.

"Statistically speaking, the claimant is most likely to have developed the heart attack as a result of a blood clot which occluded an already narrowed blood vessel.

"XVI.

"Claimant has failed to prove his theory that the carboxy-hemoglobin in his

---

1. Dr. Hinrichs was Board Certified in Internal Medicine, not a general practitioner.

blood reduced the ability of the blood to carry oxygen to the heart and muscle, thereby causing his heart attack. There is no evidence of record which establishes an abnormal carboxy-hemoglobin level of the blood.

## "CONCLUSIONS OF LAW

### "I.

"The claimant has failed to prove injury by accident arising out of and in the course of his employment.

### "II.

"Claimant has failed to prove a cause and effect relationship between his heart attack and an exposure to gases in his employment.

### "III.

"Claimant has failed to prove that he was under unusual stress in performing the physical activities on date of heart attack.

### "ORDER

"IT IS ORDERED that this claim be in all things dismissed." [Footnote added.]

Schmalz appealed from the Bureau's decision to the district court. The district court affirmed the decision of the Bureau in a judgment dated June 7, 1989. Schmalz then appealed to this Court.

In an appeal from a judgment of the district court involving the decision of an administrative agency, our review is limited to an examination of the decision of the agency and not the decision of the district court. *Grace v. North Dakota Workmen's Compensation Bureau*, 395 N.W.2d 576 (N.D.1986); *Skjefte v. Job Service North Dakota*, 392 N.W.2d 815 (N.D.1986); *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979).

■ Our review of administrative agency decisions involves a three-step process:

(1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Falcon v. Williams County Social Service Board*, 430 N.W.2d 569 (N.D.1988); *Otto v. Job Service North Dakota*, 390 N.W.2d 550 (N.D.1986). In *Skjefte, supra*, this Court summarized the standards we use in reviewing administrative agency decisions as follows:

"1. We do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could have reasonably determined that the factual conclusions were supported by the weight of the evidence.

"2. We exercise restraint when we review administrative agency findings.

"3. It is not the function of the judiciary to act as a super board when reviewing administrative agency determinations.

"4. We will not substitute our judgment for that of the qualified experts in the administrative agencies."

*Skjefte* at 817–18.

Section 65–05–05, N.D.C.C., provides for the payment of compensation and other benefits to employees who have "been injured in the course of their employment." The term "injury," as used in section 65–05–05, N.D.C.C., has been construed by this Court to mean "compensable injury" as defined in section 65–01–02(7), N.D.C.C.[2] *See Grace, supra*. The relevant part of the definition that controls this case reads:

"If an injury is due to heart attack or stroke, such heart attack or stroke must be causally related to the worker's employment, with reasonable medical certainty, and must have been precipitated by unusual stress."

Section 65–01–02(7), N.D.C.C.

The legislative history of the 1977 amendment to section 65–01–02(7), N.D.

---

**2.** At the time of Schmalz's claim, in 1984, the relevant workers compensation statute dealing with heart attacks was section 65–01–02(7), N.D. C.C. The legislature subsequently amended the statute in 1989 through S.B. 2256. We do not consider whether or not that amendment will make a difference in our analysis of section 65–01–02, N.D.C.C., in the future.

C.C., to require "unusual stress" in cases of heart attacks or strokes is well documented:

> "It came about in direct response to this court's decision in *Stout v. North Dakota Workmen's Compensation Bureau*, 236 N.W.2d 889, 892 (N.D.1975), in which we held that heart attacks occurring within the course of employment that were precipitated by usual exertion were compensable. There was a significant increase in the number of claims for heart attacks after *Stout* was decided, and the statute was amended to require 'unusual stress' in order to substantially reduce a projected increase in employer premiums resulting from that decision. *See Grace v. North Dakota Workmen's Comp. Bureau, supra.* Construing §§ 65–01–02(7) and 65–01–02(12)(d) to create a statutory presumption that heart disease suffered by any employee is presumed to have been precipitated by unusual stress would be directly contrary to the Legislature's intent."

*Kroh v. North Dakota Workers Compensation Bureau*, 425 N.W.2d 899, 901 (N.D. 1988).

It has long been a basic tenet of workers compensation law that a claimant seeking benefits from the Bureau has the burden of proving by a preponderance of the evidence that he is entitled to participate in the fund. Section 65–01–11, N.D.C.C.; *Kroh, supra; Claim of Bromley*, 304 N.W.2d 412 (N.D. 1981). Therefore, Schmalz has the burden of proving by a preponderance of the evidence that his heart attack was causally related to his employment with reasonable medical certainty, and that the heart attack was precipitated by unusual stress. The Bureau concluded that Schmalz had failed to prove both the causal relationship and the unusual stress requirement.

█ Schmalz argues that the unusual stress requirement is satisfied in that his heart attack was caused by unusual working circumstances which combined to expose him to much higher levels of gases than he had previously experienced in his work. Beginning in 1980, when Schmalz first began doing work on refrigeration units, he worked out of a garage attached to his house on thirteenth street in Dickinson, which had ventilation. In 1982, Schmalz sold his house on Thirteenth Street and bought a home on First Street in Dickinson. From 1982 until 1984, Schmalz worked out of a rented shop. In 1984, Schmalz relocated his shop to a garage attached to his house, which was not properly ventilated. Schmalz contends that at the time of his heart attack, he was in the midst of the busiest appliance repair season of the year. Because the weather was cold, he contends he had to keep his doors and windows shut to save on his heating bill and, therefore, with no ventilation, the gases produced from his work were trapped in his small shop. Schmalz contends that these facts show by a preponderance of the evidence that he was exposed to a concentration of gases which was at least several times higher than he had previously experienced in his work.

We have previously explained our view of the unusual stress requirement as follows:

> "This Court has indicated that Section 65–01–02–(7) does not require that the work causing the heart attack be different in nature from the employee's usual work; however, it does require unusual stress. *Nelson* [*v. North Dakota Workmen's Compensation Bureau*], 316 N.W.2d [790] at 796 [N.D.1982]. The Court in *Nelson* relied partially upon the Colorado Supreme Court's decision in *City and County of Denver v. Industrial Commission*, 195 Colo. 431, 579 P.2d 80 (1978). The Colorado court derived its unusual or extraordinary exertion test in part from *Schechter v. State Insurance Fund*, 6 N.Y.2d 506, 190 N.Y.S.2d 656, 160 N.E.2d 901 (1959). In *Schechter* the Court of Appeals of New York stated the appropriate test for unusual strain as follows:
>
> > 'The phrase "unusual or excessive strain", as sometimes used in describing these cases, is not so limited in its meaning as to include only work of an entirely different character from that customarily done. Simply stated, so

long as the conditions of performing the work are such that an exceptional strain is imposed on the worker so great that his heart is affected and damaged thereby, the requirement of unusual or excessive strain is satisfied.' 190 N.Y.S.2d at 660, 160 N.E.2d at 904.

Professor Larson explains unusualness as follows:

'[U]nusualness may be a matter of degree, not of kind. It may appear in the duration, strenuousness, distance, or other circumstances involved in the execution of routine assignments.' 1B A.Larson, *The Law of Workmen's Compensation*, § 38.64(a)(9) (1986); *See also Chapman v. Wilkenson Company*, 222 Kan. 722, 567 P.2d 888 (1977); *Hamilton v. Procon, Inc.*, 434 Pa. 90, 252 A.2d 601 (1969)."

*Grace, supra* at 580–81.

■ Our examination for unusual stress must be applied according to the employee's complete work history. *Grace, supra* at 581; *Nelson v. North Dakota Workmen's Compensation Bureau*, 316 N.W.2d 790, 796 (N.D.1982). Schmalz had been repairing refrigeration units for approximately five years before his heart attack. He had been working in his unventilated garage, however, for less than one year before his heart attack. There is no evidence, however, to disclose the amount of the gases which Schmalz was exposed to before or after his relocation to his unventilated garage. Schmalz contends that because his shop was not properly ventilated, he was exposed to a higher amount of the gases than otherwise.

We conclude that a reasoning mind could have found, as did the Bureau, that Schmalz failed to prove by the weight of the evidence from the entire record that his heart attack was precipitated by unusual stress.

■ Schmalz also needs to prove by a preponderance of the evidence that his heart attack was causally related to his employment, with reasonable medical certainty. We do not believe that reasoning minds could conclude that he has accomplished that feat. There is no evidence even of the extent of noxious gases that may have been produced by the soldering under the peculiar circumstances of this case, nor is there any evidence of the amount of the gases that may have been absorbed in the blood stream of a person of same age, size, and physical condition of Mr. Schmalz.

There is conflicting medical evidence as to the effect of the gases upon Schmalz. Dr. Mark Hinrichs was Schmalz's physician. Schmalz asserts that Dr. Hinrichs' opinion is enhanced due to his research and the number of people he had consulted regarding the nature of the gases. However, in checking his references, we note that they are not efforts of research by Dr. Hinrichs, but rather are reports provided to Dr. Hinrichs by Schmalz's attorney.[3] After a lengthy hypothetical question, which assumed a number of facts, Dr. Hinrichs was asked by Mr. Schmalz's attorney whether or not the toxic fumes would be a causative factor in Mr. Schmalz's heart attack on November 29, 1984. Dr. Hinrichs responded:

"Given the pre-existing scenario of a decreased cardiac blood supply on the basis of sclerotic lesion, a narrowing of the coronary artery, coupled with the reduction in the oxygen carrying capacity of the blood, I think that this may have played a role in the patient's heart attack.

\* \* \* \* \* \*

"That's a difficult question to answer, because I can't say with honest certainty, but it appears that from the information concerning these gases, it very well may have had a triggering, precipitating role in the problem which he encountered.

\* \* \* \* \* \*

"Q Okay. Now, Doctor, when you're giving your opinion here, what you're

---

**3.** Dr. Hinrichs testified that he relied on information provided to him by Schmalz's attorney. While this information may have been helpful to him, we do not give it as much credence as we would have had it been personal research done by Dr. Hinrichs.

saying is you haven't had an opportunity to personally study the situation, you weren't there while this process was going on, and so what you're saying is that you can't absolutely say that, number one, he was in the situation, is that correct, that I described?

"A Well, as you say that, I was answering specifically to the scenario that you were referring to.

"Q Okay.

"A And I am saying that I, as in all things in medicine, I can never say absolutely, certainly, positively.

"Q But you're as sure as you possibly can be that this did contribute to the process?

"A Yes."

During cross-examination, Dr. Hinrichs testified:

"Q And isn't a likely explanation—or, as likely an explanation for Mr. Schmalz's heart attack is the one that's been talked about earlier, is that he had this narrowing of the artery and a clot came through or a spasm blocked it off the rest of the way, and he had the heart attack?

"A Something like that may very well have happened.

"Q That's the usual way heart attacks happen?

"A That's correct. That's right.

"Q And Mr. Schmalz was at risk for that heart attack, wasn't he?

"A That's correct.

"Q Mr. Schmalz was overweight, wasn't he?

"A Yes.

"Q He had high cholesterol reading?

"A Mm-hmm.

"Q High blood pressure?

"A That's correct."

There is no evidence in the record as to the amount of the gases in the air nor as to the amount of the gases in Schmalz's blood at the time of the heart attack. In response to questions, Dr. Hinrichs had previously testified:

"Q Okay. Did you do any blood studies that would show any gases that might be trapped in his blood, or anything like that?

"A We did not do any specific studies looking for the presence of any toxins, or foreign substances.

\*    \*  ·  \*    \*    \*    \*

"Q Okay. So, in other words, there really was no test—believe me, Doctor, this is not in criticism—there were no tests made that would determine what gases were present in his blood at the time?

"A That's right."

The Bureau deposed a cardiologist, Dr. Walter Frank. In response to questioning, Dr. Frank testified:

"Q ... Finally, Doctor, based upon your review of the records and your research in this case, have you had occasion to form an opinion concerning what the more likely precipitating event of the —Mr. Schmalz's heart attack was, whether it would have been a clot or an exposure to an unknown level of these gases, and I'm sorry, I don't think that we can tell you how much gas was in the air, but I—

"A. Well, I think, in my opinion, Mr. Schmalz does have atherosclerotic heart disease. He had what we call preinfarctions angina where he had progressive angina and then had a heart attack. On a statistical basis we know there is over a nine-out-of-ten probability that was due to a blood clot forming in that area. Most of the time we don't know why the blood clot forms. From my reading of the literature, certainly gases such as carbon monoxide which stick to the hemoglobin in the bloodstream more than oxygen does, may play an—a part in some heart attacks, but in this particular case how much, what gases were there and how many of them were there, I just am not able to tell.

\*    \*    \*    \*    \*    \*

"A. I think what you would need even better than exposure in the room is evidence of exposure to the patient with the gas in his bloodstream, because it's that gas in the bloodstream that's caus-

ing the problems, and I would like to have seen what the level of carbon monoxide or other gases were in the bloodstream at the time the person was having the heart attack."

In assessing such medical evidence, we have previously said:

"[T]he Bureau needs to make reasonable efforts to clarify discrepancies arising out of inconsistent medical reports. This clarification includes situations where the conflicting medical evidence is from different physicians. *See Claim of Bromley*, 304 N.W.2d 412 (N.D.1981). Notwithstanding this expansion, we must keep in mind the basic rule which was stated in *Bromley* by Justice Sand who first enunciated our medical evidence discrepancy rule: 'Normally, it is within the province of the administrative agency, not the courts, to weigh conflicting medical opinions and to resolve these conflicts. *Hassler v. Weinberger*, 502 F.2d 172 (7th Cir.1974).' *Howes v. Workers Compensation Bureau*, 429 N.W.2d 730, 734 (N.D.1988), *citing Bromley, supra* at 417."

*Hayden v. North Dakota Workers Compensation Bureau*, 447 N.W.2d 489, 498 (N.D.1989).

In *Syverson v. North Dakota Workmen's Comp. Bureau*, 406 N.W.2d 688 (N.D.1987), we discussed the "causally related to employment" requirement. Syverson asserted that his arthritic shoulder condition was brought on or worsened by his employment as a furniture and appliance handler. In rejecting Syverson's claim, the Bureau asserted that " 'the evidence does no more than speculate as to a possible causal relationship between any lifting and the arthritic injury.' " In affirming the district court's reversal of the denial of benefits we said:

"While Dr. Mardirosian may have been unable to medically pinpoint the precise origin of Syverson's arthritic shoulder condition, we believe that his testimony clearly demonstrates that he considered Syverson's employment to be a substantial contributing factor in the development of his arthritis."

Thus, an undisputed medical opinion as to the causal relationship between the alleged course and the injury was not required in *Syverson*.

*Syverson* is distinguishable, however, from the case at hand. Schmalz's injury was a heart attack, which is such a common occurrence that the legislature has adopted special rules for recovery. In *Syverson*, the claimant had not previously suffered from any shoulder disability. Schmalz, on the other hand, had suffered from an atherosclerotic heart disease, had high blood pressure, high cholesterol, and was overweight. Finally, there was evidence in *Syverson* that the claimant's continual lifting had a "wear and tear" effect on his shoulder. There is no evidence in the instant case of the amounts of gases Schmalz was exposed to, nor of the effect of any of the gases upon him.

As we do not make independent findings of fact, but ask only whether or not a reasoning mind reasonably could have determined, as did the Bureau, that Schmalz's heart attack was not precipitated by unusual stress, and was not causally related to his employment, we must affirm the Bureau's findings.

As the district court affirmed the findings of fact, conclusions of law, and order of the Workers Compensation Bureau, the judgment of the district court is affirmed.

VANDE WALLE and GIERKE, JJ., concur.

LEVINE, Justice, concurring in result.

There was no evidence at all about what volume of toxic gases in the environment is necessary to reduce the level of oxygen in the claimant's bloodstream so as to contribute to a heart attack. The Bureau's Finding No. VII acknowledges that the presence of certain gases in the environment "in sufficient quantities," will affect the health of the heart muscle. The problem is that no one told the Bureau what these "sufficient quantities" were, as a general proposition. While it would be unrealistic to require blood-gas studies of a claimant at the time of heart attack or the precise

level of noxious fumes in the environment at the time of heart attack to support a claim for compensation, it is not unrealistic to require a claimant to provide the Bureau with the scientific data necessary to inform its decision on causation and to warrant its reliance on circumstantial evidence.

I therefore agree that the Bureau did not err in determining that the claimant did not prove a causal relationship between his heart attack and an exposure to noxious gases. Accordingly, I concur in the result.

MESCHKE, J., concurs.