Diane ROGGENBUCK, Appellee,

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellant,**

and

**Orange Julius, Defendant.**

Civ. No. 910328.

Supreme Court of North Dakota.

March 3, 1992.

Ken R. Sorenson (argued), Asst. Atty. Gen., Bismarck, for appellant.

Dietz & Little Law Firm, Bismarck, for appellee; argued by Stephen D. Little, Bismarck.

ERICKSTAD, Chief Justice.

The North Dakota Workers Compensation Bureau appeals from the judgment of the District Court for Burleigh County reversing the Bureau's decision which awarded Diane Roggenbuck benefits only on a fifty percent aggravation basis. We affirm the district court and remand to the Bureau for an appropriate determination of benefits.

On October 20, 1988, Roggenbuck was injured when she fell in the Kirkwood Mall parking lot after leaving her place of employment at Orange Julius. At that time, she was diagnosed, by Ralph Aas, D.C., as suffering from cervical subluxation, cervical cranial syndrome, sacroiliac subluxation, and sprain or strain. On October 24, 1988, Roggenbuck applied for workers' compensation benefits for those injuries

arising out of that fall at work. The Bureau accepted liability and paid the associated medical expenses.[1]

Subsequent to the incident in the Kirkwood Mall, Roggenbuck continued to receive chiropractic treatment from Dr. Aas. Although the treatments resolved some of Roggenbuck's symptoms, her symptoms generally worsened over time. Eventually, Aas concluded that Roggenbuck had a disk problem and on August 29, 1989, he referred her to an orthopedic surgeon.

On September 3, 1989, Roggenbuck, and a neighbor of hers, lifted a gas stove into a child's wagon so it could be taken to the neighbor's place to be pressure cleaned. While in the process of pulling the wagon, the neighbor slipped and Roggenbuck tried to "catch" or "steady" the stove to keep it from falling. Apparently, this act of "steadying" the stove caused Roggenbuck to experience some increased pain in her back. The next morning, Roggenbuck went to work as usual, but approximately four hours later, the pain became so intense that she went to the emergency room of St. Alexius Medical Center where she was admitted. An MRI scan revealed that Roggenbuck had a large herniated disk. On September 6, 1989, Roggenbuck underwent surgery to correct the disk problem.

In early September, 1989, Roggenbuck informed the Bureau of the surgery and of post-operative disability. On September 19, 1989, Roggenbuck made a claim for benefits in conjunction with the October 20, 1988, incident. The Bureau thereafter contacted Roger Kennedy, M.D., the physician who treated Roggenbuck for the disk herniation, and Ralph Aas, D.C., for medical records and opinions as to the relationship between the 1988 slip and fall incident, the 1989 steadying of the stove, and the subsequent surgery. On April 2, 1990, the Bureau sent a letter to Dr. Kennedy, asking him to apportion percentages of causation between the nonwork-related stove moving incident and the prior work-related slip and fall incident. Dr. Kennedy responded that

---

1. Apparently, when the Bureau accepted liability for the 1988 fall in the Kirkwood parking lot, no issue was ever raised as to whether the incident occurred within course and scope of employment.

he could not apportion the percentages of the injuries on the basis of the work- and nonwork-related incidents. The Bureau, subsequently, on May 15, 1990, awarded benefits for a nonemployment aggravation of an employment injury on a fifty percent aggravation basis pursuant to section 65–05–15(4), N.D.C.C.[2]

Roggenbuck thereafter made a request for administrative review. An administrative hearing was held on March 4, 1991. The hearing officer, in his findings of fact, conclusions of law, and order of May 16, 1991, affirmed the Bureau's prior decision, holding that "[c]laimant's non-employment injury of September 3, 1989, acted upon claimant's prior compensable injury and substantially contributed to the need for medical attention and disabling claimant from employment." Roggenbuck then appealed to the district court which reversed the decision of the Bureau holding that the Bureau had improperly invoked the aggravation statute. This appeal followed.[3]

■ Initially, we note that when an administrative agency decision is appealed to this Court, we review the decision of the agency and not that of the district court. *White v. North Dakota Workers Compensation Bureau*, 441 N.W.2d 908, 909 (N.D. 1989). We limit our review to the record before the agency and do not consider the finding of the district court. *Asbridge v. North Dakota State Highway Commissioner*, 291 N.W.2d 739, 743 (N.D.1980).

Under sections 28–32–19 and 28–32–21, N.D.C.C., we will affirm an administrative agency decision unless one of the six enumerated reasons listed in section 28–32–19, N.D.C.C., is found to exist. *In re Annexation of Part of Donnybrook Public School*

*District No. 24,* 365 N.W.2d 514, 519 (N.D. 1985).

■ We have noted that our review of administrative agency decisions under section 28–32–19, N.D.C.C., essentially involves a three-step process: (1) Are the findings of fact supported by a preponderance of the evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? *Tobias v. North Dakota Department of Human Services*, 448 N.W.2d 175, 178 (N.D.1989); *Falcon v. Williams County Social Service Board*, 430 N.W.2d 569, 571 (N.D.1988).

In determining whether or not an agency's factual findings are supported by a preponderance of the evidence, "we do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether a reasoning mind could reasonably have determined that the factual conclusions were supported by the weight of the evidence." *Tobias*, 448 N.W.2d at 178; *see also Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979). "This court exercises restraint and will not act as a 'super board' when reviewing administrative findings and decisions." *Midwest Property Recovery v. Job Service*, 475 N.W.2d 918, 921 (N.D.1991); *Matter of Boschee*, 347 N.W.2d 331, 335 (N.D.1984).

In this case, the Bureau awarded benefits to Roggenbuck pursuant to section 65–05–15(3), N.D.C.C., which provides:

"In case of aggravation of a prior compensable injury by a nonemployment injury, the aggravation statute may be invoked where the nonemployment injury acts upon the prior compensable injury,

---

**2.** The Bureau does not dispute that Roggenbuck's condition requiring surgery was causally related to the October 1988 fall in the Kirkwood Mall parking lot. Rather, the Bureau asserts that the September 3, 1989, incident substantially contributed to Roggenbuck's condition, which requires that the benefits be awarded on the basis of fifty percent when apportionment is impossible.

Section 65–05–15(4), N.D.C.C., reads:
  "4. The bureau shall determine the aggravation award based upon all evidence, as reasonably establishes the proportion or percentage of cause as is reasonably attributable to

the compensable injury. If the degree of aggravation cannot be determined, the percentage award must be fifty percent of the total benefits recoverable if one hundred percent of the injury had been the result of employment."

**3.** Counsel for the Bureau, in his brief seemed to stress that Roggenbuck had felt pain in her right leg after moving the stove and in her left leg prior to that. However, both Dr. Kennedy and Dr. Aas indicated that this was not uncommon and did not indicate different injuries.

and *substantially contributes* to the severity, acceleration, or progression of the final result, or, if it acts as a trigger to produce recurrent symptoms, and the trigger is itself a substantial aggravating or accelerating factor. All benefits may be apportioned when the aggravation statute is invoked under this subsection. *The aggravation statute may not be invoked if the result is but a natural progression of the compensable injury.* [Emphasis added.]"

Thus, the issue before us is whether or not the Bureau properly invoked this provision. More specifically, the issue is whether or not a reasoning mind could have reasonably concluded that the greater weight of the evidence indicated that the nonemployment related injury, of September 3, 1989, substantially contributed to the severity, acceleration or progression of Roggenbuck's condition, or if it acted as a trigger to produce recurrent symptoms when the trigger itself was a substantial aggravating or accelerating factor. In essence, the issue is two-fold, i.e.: (1) Whether or not this injury substantially contributed to Roggenbuck's condition; and (2) Whether or not the result is but a natural progression of the compensable injury. In considering these questions, we recognize that it is for the Bureau to initially answer these questions, and in reviewing its findings, we keep in mind our past decisions.

In light of the ambiguity resulting from the amendments to section 65–05–15, N.D.C.C., we believe it appropriate to consider legislative history and to consider the amendments in light of the previous statutory provisions, to aid us in determining the intent or objective of those amendments. *See State v. Mees,* 272 N.W.2d 61, 65 (N.D. 1978) ("[a]ny amendment or repeal of any part of a statute must also be considered in determining the true subsequent intent and objective of the legislature"); and *Blackburn, Nickels & Smith, Inc. v. National Farmers Union Property & Casualty Company,* 452 N.W.2d 319, 322 (N.D.1990) ("[w]hen interpreting an ambiguous statute, the court may consider its legislative history and the circumstances under which the statute was enacted.")

Previously, section 65–05–15, N.D.C.C., read:

"*65–05–15. Aggravation of injury or disease—Compensation and benefits not paid for preexisting condition.* Compensation shall not be paid for any condition which existed prior to the happening of a compensable injury nor for any disability chargeable to such condition. In case of aggravation of a condition existing prior to a compensable injury and in case of the aggravation of a compensable injury by a nonemployment injury, compensation, medical or hospital expenses, or death benefits, shall be allowed by the bureau and paid from the fund only for such proportion of the disability, death benefits, or expense arising from the aggravation of such prior condition as reasonably may be attributable to such compensable injury. If the degree of aggravation cannot be determined, the percentage award shall be fifty percent of total benefits recoverable if one hundred percent of the injury had been the result of employment. But any compensation paid on the basis of aggravation shall not be less than ten dollars per week unless the actual wages of claimant shall be less than ten dollars, in which event the actual wages shall be paid in compensation. However, in case of death due to an employment-aggravated condition, burial expenses and special benefits shall be paid in full pursuant to sections 65–05–17 and 65–05–26."

Our limited review of the legislative history surrounding the amendments to section 65–05–15, N.D.C.C., reveals little which might aid us in construing 65–05–15(3). The amendments to section 65–05–15 were but a small part of a large number of changes which the 1989 legislature made to the workers' compensation statutes. *See* S.L.1989, ch. 766. However, we do note that the fiscal note for the proposed legislation indicated that "[a] majority of the changes in this bill will have little or no fiscal impact on the fund." Furthermore, Dean Haas, apparently speaking for the Workers Compensation Bureau, as reported in the Senate Standing Committee Min-

utes for the bill, stated that the bill was essentially a housekeeping bill.[4]

The change in the language relevant to nonwork-related aggravations of prior compensable injuries appears to be in the nature of further refinement. The new language appears to further refine what is meant by aggravation of a prior compensable injury by referring to "severity, acceleration, or progression" or where something "triggers" recurrent symptoms. The construction to be placed upon the term "substantial" would thus appear to be the primary focus.

In its final decision, the Bureau made the following relevant findings of fact:

## "V.

"Claimant sustained an increase in back pain on September 3, 1989, when she lifted a gas stove and had tried to catch it as it slipped in an off-work accident.

\*　\*　\*　\*　\*　\*

## "VIII.

"In a December 4, 1989, letter to the Bureau, Dr. Kennedy stated that based on claimant's history, the September of 1989 incident was the immediate precipitating cause for her disc herniation requiring surgery. Further, there was a suggestion of disc herniation that occurred in October of 1988, which caused claimant to have continuous trouble, however, the September of 1989 event really precipitated the operative treatment.

## "IX.

"In an April 13, 1990, letter to the Bureau, Dr. Kennedy stated that based on claimant's history, with the leg symptoms she had, and with the October 20, 1988, injury, it is likely that she sustained a herniated disc at that time although he cannot prove it. The nonemployment injury on September 3, 1989, was the immediate precipitating incident of her admission of September 4, 1989. The doctor indicated that he is unable to attribute the percentages of the work or non-work related injury.

\*　\*　\*　\*　\*　\*

## "XII.

"Dr. Aas testified that claimant's diagnosis changed over the course of her treatment from December of 1988 to August of 1989. Claimant's cervical subluxation and cervical cranial syndrome resolved itself, and the sacroiliac subluxation and strain remained. Further, during the course of treatment between December of 1988 and August of 1989, Dr. Aas did not impose any lifting restrictions....

## "XIII.

"Dr. Aas testified that after the October 20, 1988, injury claimant did not show any immediate symptoms of a disc problem. Further, Dr. Aas testified that

---

4. Haas, as reported in the House Standing Committee Minutes, testified in part as follows:

"Section 5 is an amendment to the aggravation statute. This is what allows to apportion to a preexisting condition and thereby lower the benefit it pays. The amendment deals with how the aggravation statute is applied and the benefits that are paid. The bureau is asking for the clarifying language and allow the bureau to identify those cases where the aggravation statute is going to be invoked. It provides that the bureau will pay the medical bills in full after the work injury. Allowing the full award during the accute [sic] injury stage."

Haas, apparently in prepared testimony, testified in part as follows:

"The statutory amendment also sets forth a test of compensability where a non-employment injury aggravates a prior compensable injury. The aggravation award may be invoked as to all expenses if the non-employment injury acts upon the compensable injury and substantially contributes to the severity, acceleration, or progression of the final result. Initial medical treatment is also paid on an aggravation basis because the initial treatment will likely have been sought due to a non-employment trigger or injury. The amendment affirms the general principle that the aggravation statute cannot be invoked if the result is but a natural progression of the compensable injury. Paragraph four essentially restates current law, and section five is verbatim from the current statute."

the October 20, 1988, injury did not cause the disc lesion, however, it did cause a lack of balance or functional disorder of the whole pelvic muscle group, added stress and strain on the whole area involved, and made the area much more susceptible to injury or subsequent injury.

\* \* \* \* \* \*

"XV.

"Dr. Kennedy testified that he does not believe the single injury of carrying a stove would have caused the disc herniation, as claimant had a large, ruptured, mushy disc for some time. The single incident of carrying a stove would not have caused a disc herniation without some preexisting condition.

"XVI.

"Dr. Kennedy testified that, notwithstanding the September 3, 1989, injury, claimant's back condition would not have progressed to the condition that he saw her in during his course of medical treatment. Further, the doctor testified that, notwithstanding the September 3, 1989, injury, the claimant could have continued with conservative treatment."

Initially, we note a few factual discrepancies in the Bureau's findings. First, as to finding XII, we note that Dr. Aas' diagno-

sis also changed to include lumbar subluxation and strain. Further, it is undisputed that on August 29, 1989, Dr. Aas was of the opinion that Roggenbuck had a disk problem, not responding to treatment, for which he referred her to an orthopedic surgeon. As to finding XIII, it is clear from Dr. Aas' testimony that he did not unequivocally state that the October 20, 1988, fall did not cause a disk lesion.[5] Rather, he was of the opinion that the fall lead to a condition where the disk lesion was occurring through a gradual process.[6]

As to finding XVI, Dr. Kennedy testified as follows:

"Q. In the absence of that—catching that stove and in the absence of any other *traumatic type of injury* similar to catching a tipping stove, could she have continued with conservative *chiropractic* treatment *for a while?*

"A. It's quite likely. Yes. [Emphasis added.]"

As mentioned above, Dr. Aas indicated that conservative chiropractic treatment was not working.

In support of its decision, the Bureau primarily relies on Dr. Kennedy's statement that the September 3, 1989, incident was the "immediately precipitating cause for her disk herniation requiring surgery" and the fact that Dr. Kennedy indicated that without the September 3, 1989, inci-

---

5. Dr. Aas testified in relevant part as follows:

"A. Well, the injury she sustained from the fall *didn't probably* cause the disk lesion, but it caused—we'll say lack of balance, a functional disorder of that whole pelvic muscle group, added stress and strain on the whole area involved, and due to added—it made the area much more susceptible to injury or subsequent injury, but it didn't cause the injury. It would lend a lot of instability to that area, weakening it.

"Q. Again, the lesion occurred sometime prior to the second accident, though?

"A. The lesion was occurring—

"Q. Okay. Is this a gradual process?

"A. —in my opinion. They're almost always a gradual process unless there is severe trauma.

"Q. Okay. So I have it straight in my own mind, the fall in '88 created an instability which led to—is that—led to a—

"A. It would—

"Q. disk lesion?

"A. It could lead to any type of disorder. In her particular case, it was beginning to show up, you know, as time went on, that there was going to be more and more.

"Q. Okay. You could tell by the symptoms she was exhibiting, I assume, that something was appearing?

"A. Yes. She was—she was demonstrating at times much more instability in the area. She could do something and it would bring about an effect. She could do less to bring about an effect in something. [Emphasis added.]"

6. Regarding Dr. Aas' use of the term disk lesion we find the following from his testimony pertinent:

"Q. When you say disk lesion, does that mean some sort of protrusion?

"A. A disk lesion as—well, as I use it, or I might say we use it—a disk involvement where it's causing a problem but not specifically whether it's a ruptured disk, slipped disk, fractured disk."

dent, it was likely that Roggenbuck could have continued with conservative treatment for a while.

■ However, the fact that an incident precipitated the need for treatment, or precipitated an injury's becoming disabling does not necessarily mean that such an event substantially contributed to the severity, acceleration, or progression of the condition or that it was a substantial factor in it. Likewise, the fact that a person would not have immediately required surgery had the precipitating event not occurred does not necessarily mean the event was in any way a substantial factor. In other words, a precipitating injury or incident may well be a substantially contributing factor, but the terms are not synonymous.

In this case, we find the following relevant testimony from Dr. Kennedy:

"Q. Okay. Dr. Aas indicated in his deposition that he had referred her for evaluation and possible treatment by a neurosurgeon prior to the stove incident, based on her progressive complaints throughout his course of treatment.

"I know Mr. Sorenson has asked you whether you can speculate as to whether she would have required surgery anyway or whether her disk would have ruptured anyway. Does that progressive history which she evidenced indicate that the disk is in fact—or was in fact getting more unstable or becoming more likely to rupture?

"A. I think I understand your question, because in reviewing the records, I felt that she did have a disk injury as early as what we have recorded that first injury because of its lack of response to the usual chiropractic treatments and clear up, and I think I made a statement to that effect.

"There was some radiation of the pain down into the leg, which sounded like a disk protrusion or rupture. I do believe that she had a damaged disk that would intermittently protrude; that it was somewhat unclear because of her history and what I could gather as to whether it had been on the right side sometimes and the left side other times. But I felt certain in my mind that she did have a damaged disk.

"Q. Is it unusual for radiating leg pain to kind of show up on one leg and then another?

"A. Not that unusual. Particularly if it's a large ruptured disk. And if it's very mushy or soft—in fact, it can affect both legs at the same time. So if it's a very soft disk, depending on the way the trunk is bent, it may tend to protrude or rupture one side more than the other, but can affect either leg.

"Q. What did you find on examination when you actually went in for the surgery? What sort of ruptured disk are we talking about?

\*　\*　\*　\*　\*　\*

"A. I noted that the rim or the anulus, which is the rim of the disk, was markedly soft, mushy or softer than normal, indicating that the disk had degenerated beneath it. The rim of the disk was then opened and a large amount of soft, very mushy and fragmented disk material was removed from the disk space. So it was a very soft and mushy disk, literally one that had no consistency to cushion the usual back.

\*　\*　\*　\*　\*　\*

"Q. Okay. Someone with a disk like that, what sort of action would trigger the rupture?

"A. Well, when the—when the disk becomes so soft and mushy, it's usually—takes very little incident to—'the straw that breaks the camel's back'—to make it, frankly, rupture again, or even a piece of it become extruded or caught under the nerve.

"When it's so soft, a simple movement of the back, a simple bending forward over the sink to wash your face, a sneeze, any of these things can be the last straw.

"The actual degeneration of the disk where it becomes mushy is a continuous thing and it tends to become worse with time. It's hard to tell exactly how fast an individual disk is going to deteriorate.

But as it becomes softer and more deteriorated, it takes less for it to actually rupture out and pinch the nerve, and you can have multiple events along the line.

\* \* \* \* \* \*

"A. Well, I think looking at her specific disk that was so degenerated, that the inciting events that caused her hospitalization could have been any of a number of different injuries. . . .

\* \* \* \* \* \*

"A. Because as a disk deteriorates, the normal motion of the spine produces, if you will, trauma to the disk, so just by a weight of the spine being traumatic to a damaged disk. A trauma means an injury, and there's a lot of evidence that the whole process of disk deterioration is due to minuscule episodes of trauma, if you will, or wearing of the disk.

\* \* \* \* \* \*

"Q. Okay. I understand. Symptoms may coincide with the herniation, but the herniation may not coincide with the injury?

7. Dr. Aas testified in relevant part as follows:
"Q. Is it safe to say you weren't surprised that she wound up in the hospital for surgery?
"A. No. I expected that she would.
"Q. Okay.
"A. Otherwise, I wouldn't have sent her out.

\* \* \* \* \* \*

"Q. Okay. Can you tell me whether you can apportion what percentage or how much of her condition at the time of surgery was attributable to the accident in '88 and the increasing symptoms and how much was attributable to the accident on September 3rd, 1989?
"A. No. I couldn't because—well, comparable to, say, the straw that broke the camel's back. If 15 straw wouldn't have been there, this wouldn't have happened. The ten thousandth straw wouldn't have done it.
"Q. Okay. When you recommended—or when you referred her to an orthopedic surgeon on August 29, 1989, can I assume it wouldn't have taken much to cause the symptoms, if you're aware of the symptoms she exhibited when she went into the hospital?
"A. Sometimes no. Very little. Again, you can't say how much—what it would take. That's looking at that period of time. Any one little thing could do it, or large thing or whatever.

"A. Yeah. The initial injury may be the one that damaged the disk to make it soft and begin its degeneration. The rupture or protrusion of the disk outward pinching the nerve is heralded by the sciatic pain, which may come and go, so that when you're talking about an injury, you may actually damage the disk and make it degenerate, but not have a herniation at that moment. It may come later."

■ From the above-quoted testimony, it is clear that Dr. Kennedy was of the opinion that Roggenbuck's disk problem had likely begun with the October 1988 fall and that it progressively worsened until it reached a stage where any number of everyday activities could have precipitated the need for surgery. Dr. Aas was of a similar opinion.[7]

Under section 65–05–15(3), N.D.C.C., "[t]he aggravation statute may not be invoked if the result is but a natural progression of the compensable injury." Thus, in some sense, an everyday activity or event can never substantially contribute to the severity, acceleration, or progression of a condition.[8] In this case, the precipitating

"Q. Okay.
"A. Any one thing can do it and it wouldn't take much."

8. Although section 65–05–15(3), N.D.C.C., speaks to whether or not a subsequent event or incident "substantially" contributes to the end result, and not whether or not the subsequent event was an intervening cause, we nevertheless note the following language from Larson, *Workmen's Compensation Law*, section 13.11:

"[C]laimant had suffered a compensable accident in 1966, injuring his back. Several years later, this condition was triggered by a sneeze into a disc herniation, for which claimant required surgery. The medical testimony was that because of the back condition, it was probable that had claimant not had the sneezing episode, some other major or minor event would have eventually necessitated surgery. The finding that the sneezing episode was the *independent cause of claimant's disability*, and the resultant denial of compensation, were held to be error, and benefits were awarded on appeal. This result is clearly correct. The presence of the sneezing incident should not obscure the true nature of the case, which is nothing more than that of a further medical complication flowing from a compensable injury. If the herniation had occurred while claimant was asleep in bed, is

event was found to be the moving of the stove.[9] However, there is little evidence in the record other than the weight of the stove and the possible effort to steady it on the wagon, which seems minimal, to indicate that the incident with the stove resulted or could have resulted in a condition different from that resulting from an everyday activity or incident. There was no testimony by either doctor which would in any way suggest that the final result in this case was different from that which would have resulted from an everyday activity, such as bending over a sink, had that been the precipitating event.

The trial court, in its memorandum opinion, said: "the event cannot be affirmatively characterized as a 'substantial' contribu-

characterization as a mere sequel to the compensable injury would have seemed obvious. The case should be no different if the triggering episode is some nonemployment exertion like raising a window or hanging up a suit, so long as it is clear that the real operative factor is the progression of the compensable injury, associated with an exertion that in itself would not be unreasonable in the circumstances."

9. Relative to the stove moving incident, Roggenbuck testified, in relevant part, as follows:

"Q. Okay. So you have to move the stove across the street?
"A. Yes.
"Q. Okay. How did you do that?
"A. Mr. Butz took one side of the stove, I took the other side and we lifted it on a child's wagon.
"Q. Okay. Did you experience any pain lifting that stove?
"A. No.
"Q. Well—
"A. Not any more than what I did at work.
"Q. Okay. Okay. So you put it on a wagon?
"A. Yes. A child's wagon.
"Q. Okay. Like a Radio Flier red wagon my kid has?
"A. Very similar to it.
"Q. Okay. Pull it across the street then?
"A. Yes.
"Q. Both of you do that?
"A. Mr. Butz was pulling the wagon and I was just kind of setting it—but the stove sat on the wagon where it didn't jiggle or anything, you know. I mean, the way it sat on there.
"Q. Balancing it?
"A. I wasn't really balancing it. I was just walking behind it, but I had my hands on the stove.

ting factor because there is no *rational way* of quantifying this event in this manner in this case. [Emphasis added.]" We conclude, as the trial court apparently concluded, that a reasoning mind could not have reasonably concluded that the incident with the stove substantially contributed to Roggenbuck's condition.

For the aforementioned reasons the judgment of the district court is affirmed and this case is remanded to the Bureau for appropriate disposition in accordance with this opinion.

MESCHKE and LEVINE, JJ., and NORMAN J. BACKES, District Judge, concur.

"Q. Okay. Did the—there's reference in the record to the stove slipping and you catching it. Okay? And I think the reference probably came from you. So what did you mean by that?
"A. Well—
"Q. Did—okay. Let me ask you: Did Mr. Butz slip?
"A. Yes. Mr. Butz slipped.
"Q. Okay. When he was pulling the wagon?
"A. Yes.
"Q. Okay. Did the stove fall or tip or anything?
"A. No. I just steadied it on the wagon there, and maybe that's what I was referring to when I said twisted, or something.
"Q. You didn't lift the stove by yourself?
"A. No.
"Q. Okay. There's also reference in the record to—I think you told Dr. Kennedy that you experienced—when, basically, caught the stove and experienced pain?
"A. I experienced a little pain at that time, but it went away.
"Q. Okay. Same sort of—
"A. At that time.
"Q. Okay. Let me ask you something: Was the pain you experienced then any different from the pain you experienced doing other activities?
"A. No.
"Q. Okay. Same sort of thing? Can you, again, as best you can, estimate how much that stove weighed?
"A. I estimated it right around 60 pounds, in that area.
"Q. Okay. How big was the stove?
"A. A 30-inch range.
"Q. Okay. Gas; right?
"A. Yes.
"Q. Okay. Everything taken out?
"A. Uh-huh."

NORMAN J. BACKES, District Judge, sitting with the Court, due to the resignation of the Honorable H.F. GIERKE III, as of November 20, 1991.

VANDE WALLE, Justice, concurring specially.

We are reviewing an increasing number of worker compensation cases involving back ailments, primarily disc problems. Those cases pose difficult factual questions as to whether or not the claimant has injured his or her back "in the course of their employment," a condition of compensation pursuant to section 65–05–05, NDCC, and more specifically, whether the injury is a "compensable injury," defined by section 65–01–02(8), NDCC, to mean "any disease which can be fairly traceable to the employment" but which excludes "Ordinary diseases of life to which the general public outside of the employment is exposed ... except where the disease follows as an incident to, and in its inception is caused by a hazard to which an employee is subjected in the course of his employment." That statute also excludes from the term "compensable injury" an injury "attributable to a preexisting injury, disease, or condition which clearly manifested itself prior to the compensable injury" except "where employment substantially aggravates and acts upon an underlying condition, substantially worsening its severity, or where employment substantially accelerates the progression of an underlying condition." NDCC § 65–01–02(8)(b)(6). It was because of a similar difficulty in determining cause and effect of employment in heart attack and stroke cases that the Legislature amended the statute to require that injuries due to heart attack and stroke must have been "precipitated by unusual stress" in order that they be deemed a compensable injury. NDCC § 65–01–02(8)(a)(3). *See Nelson v. North Dakota Workmen's Compensation Bureau,* 316 N.W.2d 790 (N.D.1982).

Our review of administrative agency decisions is a limited one, as noted in the majority opinion. It is difficult for me to suppose why a reasoning mind could not conclude from the evidence adduced that Roggenbuck's activity with the stove did substantially contribute to the "acceleration ... or progression of the final result" as stated in section 65–05–15(3), NDCC. Thus Dr. Kennedy stated that it was his opinion that Roggenbuck "likely had a lesser disc herniation in October, 1988, which gave her persistent trouble but it was the September, 1989 incident that really precipitated the operative treatment." When asked whether he could "say with any reasonable medical certainty that, in the absence of that incidence with the gas stove, her back would have progressed to the same condition that you saw her in" Dr. Kennedy replied "I can't say that. No." *Compare Sloan v. North Dakota Workers Compensation Bureau,* 462 N.W.2d 638 (N.D.1990) [causal connection between work activities and a medical condition is a factual matter].

But the bothersome issue for me is why the majority determines the Bureau could not have reasonably concluded that Roggenbuck's activity with the stove "substantially accelerated" the herniation of the disc, irrespective of the probabilities that if it didn't happen then, it would have happened later. Remembering our standard of review on appeals from decisions of administrative agencies, which severely limits our own view of the evidence, the only manner in which I can reconcile the majority opinion with the evidence on that particular issue is to rationalize that our application of "substantial acceleration" will require *affirmative* evidence that "but for" the non-work related injury there was no indication that surgery would be imminent. Here, that affirmative evidence was not present. Rather, the need for surgery was imminent before the stove incident. The record reveals that Roggenbuck had been referred to an orthopedic surgeon by the chiropractor only 5 days prior to the incident and further reflects Roggenbuck was moving the stove in order that her children would not have to use a gas stove without a pilot light in preparation for her hospitalization for back surgery.

My concern with this result is that in the reverse instance in which the back condition predates employment and is not em-

ployment related, and the precipitating incident is work related, rather than non-work related, the employee will not be entitled to compensation. Thus section 65–01–02(8), NDCC, quoted at the beginning of this special concurrence, excludes from "compensable injury" those injuries attributable to a preexisting disease, injury or condition except where employment "substantially aggravates and acts upon an underlying condition, substantially worsening its severity, or where employment substantially accelerates the progression of an underlying condition." The obvious similarity between this language in section 65–01–02(8)(a)(3), NDCC, and that in section 65–05–15(3), NDCC, leads me to believe we would necessarily deny compensation in the reverse situation even though the precipitating incident was work related. Despite these misgivings, I concur in the result reached by the majority opinion.